# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| FREDDIE PEACOCK,<br>　　　　　　　Plaintiff<br><br>　　　　　　v.<br><br>CITY OF ROCHESTER; WAYNE MARKEL;<br>ROY IRVING; DEBORAH FOWLER; JOHN J.<br>WERNSDORFER; SANDRA J. WERNSDORFER,<br>SOLELY AS ADMINISTRATRIX AND<br>FIDUCIARY OF THE ESTATE OF JOHN J.<br>WERNSDORFER; and JOHN DOE POLICE<br>OFFICER;<br>　　　　　　　Defendants. | **COMPLAINT<br>AND<br>JURY DEMAND** |

Plaintiff Freddie Peacock, by and through his attorneys, the law firms of Neufeld Scheck and Brustin, LLP, and Easton Thompson Kasperek Shiffrin, LLP, states as follows:

## INTRODUCTION

1.　　　Mr. Peacock spent nearly six years in jail and prison and an additional nearly 10 years on parole for the rape of J.W.[1]—a crime he did not commit. The rape was committed by a lone perpetrator who, to this day, remains at large for this crime.

2.　　　This tragedy was no mistake. When Defendants Wernsdorfer, Markel, Irving and Fowler responded on the morning of J.W.'s attack, they were faced with a rape victim who could not conclusively identify her rapist. But rather than conduct an adequate investigation to discover the true perpetrator, they alighted onto Mr. Peacock, who they knew to suffer from serious mental illness. When Mr. Peacock adamantly denied raping J.W., rather than conducting a responsible investigation—including investigating Mr. Peacock's solid alibi—Defendants attempted to coerce and ultimately fabricated an admission linking him to the crime. They then

---

[1] To protect the rape victim's privacy, she is referred to in this Complaint only by her initials.

1

misrepresented to prosecutors in their written reports and orally that they had carried out a lawful interrogation during which Mr. Peacock had confessed to the crime. This misrepresentation, along with their false reporting around the circumstances of J.W.'s purported identification, virtually ensured his wrongful conviction.

3. Mr. Peacock maintained his innocence throughout investigation and trial, but due to Defendant Officers' misconduct was nonetheless convicted on December 16, 1976 and sentenced to an indeterminate term of up to 20 years' imprisonment. He was released from prison on May 13, 1982, after being incarcerated for 5 years, 9 months and 20 days, and spent nearly the next 10 years on parole as a sex offender.

4. Even after he won his freedom Mr. Peacock never gave up trying to clear his name. In 2008, his efforts were finally successful: DNA testing of semen on the underwear worn by J.W. immediately after the rape and collected by the hospital conclusively excluded Mr. Peacock as the rapist. On the basis of this DNA exclusion, Mr. Peacock's conviction was vacated and the indictment dismissed on February 4, 2010.

5. Through this civil rights action, Mr. Peacock seeks to bring the Defendants' misconduct to light, to ensure they are held accountable for their actions, and to seek justice for the many years of his life that he lost for a crime he did not commit.

## JURISDICTION AND VENUE

6. Mr. Peacock brings this action pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of his rights as secured by the United States Constitution.

7. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

8. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Western District of New York, the judicial district in which the claims arose.

## PARTIES

9.　　Plaintiff Freddie Peacock is and was at all times relevant to this Complaint a citizen and resident of the State of New York. He currently resides in Rochester, New York.

10.　Defendant John H. Wernsdorfer at all times relevant to this Complaint was a duly appointed and acting police officer of the Rochester Police Department (RPD) with the rank of Detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Rochester and State of New York. He is sued in his individual capacity.

11.　Defendant John H. Wernsdorfer died on March 4, 2005. His estate was created in Monroe County, New York, and Sandra J. Wernsdorfer was named the fiduciary of that estate. Ms. Wernsdorfer was issued full letters of administration over the estate, which have never been revoked.

12.　Defendant Wayne Markel at all times relevant to this Complaint was a duly appointed and acting police officer of the RPD with the rank of Officer, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Rochester and State of New York. He is sued in his individual capacity.

13.　Defendant Roy Irving at all times relevant to this Complaint was a duly appointed and acting police officer of the RPD with the rank of Lieutenant, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Rochester and State of New York. He is sued in his individual capacity.

14.　Defendant Deborah Fowler at all times relevant to this Complaint was a duly

3

appointed and acting police officer of the RPD with the rank of Officer, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Rochester and State of New York. She is sued in her individual capacity.

15. Defendant John Doe Police Officer, whose actual name Plaintiff has been unable to ascertain notwithstanding reasonable efforts to do so, but who is sued herein by the fictitious designation "John Doe," was a duly appointed and acting police officer of the RPD with the rank of Lieutenant or Detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Rochester and State of New York. He is sued in his individual capacity.

16. Defendant City of Rochester is a municipality that is a political subdivision of the State of New York.

## THE CRIME

17. Shortly after 2:00 a.m. on July 23, 1976, 24-year-old J.W. arrived home from work and, after parking her car in the lot adjacent to her apartment building at 47 Troup Street in Rochester, New York, was grabbed from behind by an unknown, lone assailant. Standing behind her, the assailant put one hand over J.W.'s forehead and one hand over her mouth.

18. J.W. screamed, and the assailant forced her to the ground and knocked the side of her head on the concrete. He threatened her that he would kill her if she screamed again. A light came on in the apartment building, and he dragged her to the unlit side of the building and threatened her again, telling her that he would stab her if she screamed.

19.    The assailant then dragged J.W. to a nearby building where he pulled down her pants and underwear, dropped her to the ground and vaginally raped her, ejaculating. He told J.W. not to call the police and, when she agreed, let her go.

20.    Mr. Peacock was also a resident of the apartment building at 47 Troup Street, and was known to J.W. Prior to the rape, he had made two unreciprocated passes toward her, which she reported to the building superintendant, Erroll Hillary. (Hillary, who was friends with both Mr. Peacock and J.W., never took action on those complaints because he determined they were not sufficiently serious to warrant any action.) She had also seen him around the building on several other occasions.

21.    Mr. Peacock suffers from a mental illness most often diagnosed as paranoid schizophrenia. It had caused him to be committed to psychiatric hospitals repeatedly and for significant stays in the years leading up to 1976. Mr. Peacock's illness and treatment, including hospitalizations, impacted his social skills and personal presentation.

22.    At the time of J.W.'s assault, Mr. Peacock was asleep in his apartment. He had nothing to do with this horrible crime. This was confirmed by his next-door neighbor, Ida Mae Hill, who could hear everything in Mr. Peacock's apartment as if they were in the very same room due to the fact that the walls between their apartments were so thin. On the night of the rape she was awake and watching television, and she heard Mr. Peacock turn down his stereo, pull down his hide-a-bed, and heard him get into bed shortly after midnight. She later heard J.W. return to the building yelling around 2 or 2:30 a.m., and then stayed up until 4:00 a.m. Given the acoustics between the apartments, it would have been impossible for him to open his door without her hearing it. She never heard Mr. Peacock get out of bed, or leave his apartment, at any point before she fell asleep.

## J.W. MAKES NO IDENTIFICATION OF HER ATTACKER
## IN THE AFTERMATH OF THE RAPE

23.     The attack occurred outside, where it was very dark, and J.W.—who was crying

at the time—was only able to glimpse her rapist's face for a few brief moments in the dark. J.W.

never saw the rapist before he grabbed her from behind and slammed her head on the ground.

From that point on she was extremely frightened, crying, and afraid for her life.

24.     After the rapist left, J.W. pulled her pants and underwear back up and ran into the

apartment building to the superintendent, Mr. Hillary, and reported the rape to him. In response

to his questions, she explained the rape had occurred in the parking lot. But when Mr. Hillary

asked J.W. repeatedly if she knew who had done this to her, she did not identify anyone or give

Mr. Hillary any description of her rapist, or state that she knew the person who had raped her.

Mr. Hillary took her upstairs to her apartment and called the police. J.W. then called her

boyfriend and spoke to him while waiting for the police to arrive.

25.     Shortly thereafter, Officer Wayne Markel and Officer Barnes of the Rochester

Police Department (RPD) arrived at the apartment. J.W. reported to the officers that after she

parked her car in the lot, the rapist had grabbed her between the apartment buildings, dragged her

to the side of a nearby vacant building and raped her. Although Officer Markel requested a

description of her rapist, J.W. was only able to tell him that the rapist had been a black male. She

did not state that she knew her rapist, nor did she make any identification of her rapist or mention

Mr. Peacock's name.

26.     J.W then went with the officers to search the area around the parking lot and

buildings for her purse and shoes. The officers ultimately recovered the purse and shoes on the

side of the apartment building.

27.     At some point after the police had arrived, according to Mr. Hillary he again asked J.W. if she knew who had attacked her. Hillary then reported that J.W. asked him if he remembered the guy she had talked to him about in the past, but did not identify Mr. Peacock by name or directly implicate him. Hillary assumed, however, that she was referring to Mr. Peacock, given her earlier report to him about Mr. Peacock making some passes at her. But Hillary, who knew Mr. Peacock and was friends with him, did not believe he could have raped J.W. Nor did not treat J.W.'s response as an identification or even tentative identification of her rapist: he did not check Mr. Peacock's apartment to see if he was present, nor did he tell the police what J.W. had said, or tell them anything about Mr. Peacock.

28.     An ambulance ultimately arrived to take J.W. to the hospital. J.W. gave the emergency medical technician some information about herself and the attack, but she did not state that she knew her rapist, or identify her rapist as Mr. Peacock.

29.     At the hospital, J.W. was examined, a rape kit completed, and her clothing and underwear were collected. The examination revealed the presence of spermatozoa in her vagina; the doctor who examined her determined they had been left within the past 24 to 48 hours.

30.     J.W. remained unable to give officers any description of her rapist at the hospital or identify him, nor did she state that she knew who had raped her. At some point that day, July 23, J.W. signed a sworn deposition regarding the assault. In it, she described how the rapist had approached her from behind, threatened her, and raped her, detailing where the assault had occurred and what the rapist had said to her. But at no point in this deposition did she describe or identify the rapist, or mention that the rapist was someone she knew, or give Mr. Peacock's name.

## OFFICERS OBTAIN A TAINTED IDENTIFICATION

31.     Sometime after arriving at the hospital, the officers arranged for a female officer,

Deborah Fowler, to speak with J.W alone. J.W. did not positively identify her rapist to Fowler.

32.     Fowler then misrepresented the information provided to her by J.W. concerning

the rapist, and gave the officers preparing a photo array Mr. Peacock's name—even though J.W.

had never told Fowler that she knew who committed the crime. Fowler also misrepresented the

information provided to her by J.W. and the circumstances of any identification of Mr. Peacock

in her written reports and conversations with prosecutors, and upon information and belief, in her

testimony at the grand jury.

33.     Defendant Officers, including Markel and Fowler, showed J.W. a photo array that

included between 6 and 10 photos, one of which was a photo of Mr. Peacock. At no point prior

to this time had J.W. reported to any officer that Freddie Peacock had raped her, or even that she

knew who had raped her. Mr. Peacock was the only person in the photo array that J.W. had ever

seen before. According to the Defendant Officers and the victim, J.W. signaled out Mr.

Peacock's photo, saying "That is Freddie."

34.     The Defendant Officers later orchestrated a one-man, in-person show up, where
J.W. viewed Mr. Peacock.

## OFFICERS INTERROGATE MR. PEACOCK AND, IN THE FACE OF
## HIS ADAMANT DENIALS, ATTEMPT TO COERCE AND ULTIMATELY
## FABRICATE AN ADMISSION TO SECURE HIS PROSECUTION

35.     Shortly after 4:30 a.m. on July 23, 1976, only a few hours after the rape,

Defendant Officers Det. John Wernsdorfer, Officer Wayne Markel and Lieutenant Roy Irving

knocked on Mr. Peacock's apartment door loudly enough to wake him up. When Mr. Peacock

opened the door, the Defendant Officers walked into his apartment, identified themselves as

police and arrested him. They informed Mr. Peacock that a woman had been raped and that he

would need to come to the police station to be interviewed. Although Mr. Peacock immediately cooperated, he was placed in handcuffs and transported in a police car to the police station.

36.     Mr. Peacock was brought to an interview room at the Public Safety Building. The Defendant Officers immediately began asking him why he had raped J.W. Mr. Peacock adamantly, consistently, and truthfully denied any involvement in the crime. He told the Defendant Officers that he had been home all night sleeping, and knew nothing about the crime. Had the Defendant Officers bothered to investigate this statement, they would have quickly learned that it was the practice of Mr. Peacock's next-door neighbor, Ms. Hill, to listen to his comings and goings and she could corroborate that he had never left his apartment after midnight that night.

37.     The Defendant Officers knew that Mr. Peacock had been a psychiatric patient at Rochester State Hospital "numerous times," and had been prescribed psychiatric medication; They made note in their report on the day of his arrest that he was "seriously in the need of a mental examination." When the Defendant officers checked Mr. Peacock's prior record, they saw that it consisted of a mental health law arrest from October 17, 1973, for which Mr. Peacock was taken to Strong Memorial Hospital, and a disorderly conduct arrest from January 13, 1976. This disorderly conduct arrest was for standing in the middle of the street at 6:00 in the morning and yelling at cars for no apparent reason. Mr. Peacock, who was twenty-six years old, had no other prior criminal history, and no history whatsoever of violence against others.

38.     Mr. Peacock did, however, have a long history of psychiatric treatment for mental illness. Between the onset of Mr. Peacock's illness in about 1970 and the time of his July 1976 interrogation and arrest, he was repeatedly committed at psychiatric facilities including those at Strong Memorial Hospital, Rochester State Hospital and Rochester Psychiatric Center, including

two times since the beginning of 1976. His usual diagnosis was paranoid schizophrenia, although at least one doctor diagnosed him with manic depression. Over the years, he was medicated with thorazine, lithium and thioridazine.

39.     When Mr. Peacock would not confess in the face of their interrogation, and could not provide any details about the offense, the Defendant Officers took advantage of Mr. Peacock's mental illness by making illegal, false promises of leniency designed to get Mr. Peacock to admit to the crime: they told Mr. Peacock that he could go to the hospital instead of jail if he were to confess. Mr. Peacock remained adamant that he had nothing to do with the rape. Upon information and belief, the Defendant Officers misrepresented to prosecutors in writing and oral reports, and in testimony before the Grand Jury, that they made no false promises to Mr. Peacock.

40.     Despite Mr. Peacock's repeated denials, the interrogation with Defendant Officers lasted for approximately 2 ½ hours. It was or should have been clear to Defendant Officers that Mr. Peacock knew nothing about the crime and could give them no details about the crime that would be consistent with his having committed it (and again, had they investigated, they could have quickly discovered that his neighbor would corroborate that he had been asleep during the rape). In fact, the interrogation only provided the Defendant Officers with evidence consistent with Mr. Peacock's innocence and the victim's inability to make a firm identification. But the officers were unwilling to return to square one and conduct a proper investigation to determine the true perpetrator or investigate Mr. Peacock's alibi. Instead, the officers decided to coerce and/or fabricate admissions from him, maliciously or with reckless disregard of his lack of knowledge of the offense, in order to conclude their work and ensure his prosecution. Defendant Officers, including without limitation Defendant Wernsdorfer, misrepresented to prosecutors that

after approximately 30 minutes of denying any involvement in the crime, Mr. Peacock said to him, in sum and substance, "I did it, I did it. I raped a girl. I did it. I got an urge. I raped her. I am sorry. I need some help but I did do it." This was false. Mr. Peacock never made any such statement.

41. With knowledge of Mr. Peacock's psychiatric condition, Defendant Officers also misrepresented that Mr. Peacock told them that he had stopped taking his medication, that the medication controlled "urges," and that he had probably committed the rape because of an urge. Defendant Officers claimed Mr. Peacock stated, in sum and substance, "When I get the urge, I'm not sure what I do but I know I do bad things." These statements are false; Mr. Peacock never made them. In fact, Mr. Peacock was currently taking his prescribed medication and had been working at the Ramada Inn at the time of the rape—a job he would not have been able to perform if he was not taking medication to control the symptoms of his schizophrenia.

42. In addition, Defendant Officers misrepresented that Mr. Peacock said he frequently got similar urges and, due to those urges, would walk around the University of Rochester and other nearby colleges at night, hiding in the bushes and watching girls. This (falsely) corroborated Mr. Peacock's "admission" to raping J.W., even though Mr. Peacock could tell officers nothing specific about the crime. Defendant Officers provided a synopsis of the fabricated statement, but Mr. Peacock never signed it. Defendant Officers later falsely represented to prosecutors that, during the interrogation, Mr. Peacock had asked the Officers if they were referring to the girl with red hair in his building, but this detail was not included in the officers' report. Defendant Officers also testified consistent with these misrepresentations before the Grand Jury and at other pretrial proceedings, and failed to accurately report to prosecutors,

defense, and in their testimony, their own misconduct and the misconduct of their fellow officers, and that Mr. Peacock had made no admissions.

43.    At some point after Defendant Officers' interrogation of Mr. Peacock, Defendant John Doe Police Officer entered the interrogation room and asked Mr. Peacock if he had raped the girl. Mr. Peacock again denied ever raping J.W., and then told Defendant Officer John Doe that the other Defendant Officers were saying that he had raped her. Defendant Officer John Doe failed to accurately report to prosecutors, defense, or in testimony, that Mr. Peacock had never admitted to raping J.W., conspired with the other Defendant Officers to ensure Mr. Peacock's conviction through the misconduct described herein, and failed to accurately report or intercede in the misconduct of the other Defendant Officers.

## DEFENDANTS' MISCONDUCT CAUSES MR. PEACOCK'S WRONGFUL CONVICTION AND INCARCERATION

44.    Mr. Peacock was tried on December 13th, 14th and 15th of 1976. Defendant Wernsdorfer testified at trial consistent with his misrepresentations in his written reports and conversations with prosecutors that Mr. Peacock had admitted to the rape of J.W., and that Mr. Peacock had similar urges on other occasions.

45.    Despite Mr. Peacock's alibi—his neighbor, who actively listened for and could hear all of his movements in the apartment, and did not hear him leave his apartment after going to sleep around midnight—and the lack of any physical evidence connecting him to the crime, as a result of Defendants' misconduct Mr. Peacock was convicted of one count of rape in the first degree on December 16, 1976. On January 27, 1977, he was sentenced to an indeterminate term of up to 20 years' imprisonment.

46.    Mr. Peacock filed an appeal on March 29, 1977. His conviction was affirmed by the Appellate Division, Fourth Judicial Department, on May 22, 1979.

## MR. PEACOCK SPENDS YEARS ATTEMPTING TO CLEAR HIS NAME

47.    On May 13, 1982, Mr. Peacock was released from the Attica Correctional Facility onto supervised parole as a sex offender. Still determined to prove his innocence, Mr. Peacock subsequently filed a *pro se* 440.10 motion on October 10, 1985, which was denied on November 7, 1985.

48.    In 2002, even though by that time he had been out of prison for over 20 years and off parole for 10, Mr. Peacock contacted The Innocence Project seeking assistance in his efforts to clear his name. The Innocence Project and Donald Thompson agreed to represent Mr. Peacock and seek DNA testing on his behalf.

## DNA TESTING FINALLY PROVES MR. PEACOCK'S INNOCENCE

49.    On January 11, 2008, Mr. Peacock filed a motion for DNA testing on any remaining evidence from the J.W. rape. The State consented to testing on the underwear J.W. had put on immediately after the rape, which the Rochester Police Department had collected immediately after the rape at the hospital. The doctor who examined J.W. had noted the presence of sperm during his examination, which indicated that the underwear would be expected to have sperm from her assailant on it.

50.    In October 2008, LabCorp identified a single source, 13-marker male DNA profile in the sperm fraction of the biological material recovered from a cutting from the victim's underwear and, based on testing of a reference sample from Freddie Peacock, excluded Mr. Peacock as the source of the spermatozoa.

51.    Because J.W. had reported having consensual sex with her then-boyfriend approximately 1 ½ days before the rape, the parties next took steps to exclude her consensual partner as a potential source of the spermatozoa on her underwear. In November 2009, LabCorp

determined that the boyfriend, too, was excluded as the source of the sperm. Thus, the sperm on the victim's underwear was not due to the victim's consensual sex with her boyfriend before the assault, and must have been left by her rapist—who was not Mr. Peacock.

52.     Based on this post-conviction DNA testing, Mr. Peacock and the District Attorney's Office of Monroe County jointly moved to vacate Mr. Peacock's conviction and dismiss the indictment against him.

53.     That same day, February 4, 2010—33 years after Mr. Peacock's conviction— Justice David D. Egan of the Supreme Court, Monroe County granted the joint motion to vacate that conviction and dismiss the indictment pursuant to CPL § 440.10(1)(g).

## DAMAGES

54.     The actions of the Defendants, acting within the scope of their employment and agency for the City of Rochester, deprived Plaintiff Freddie Peacock of his rights under the laws of New York and the Fourth, Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.

55.     As a direct and foreseeable result of Defendants' misconduct, Mr. Peacock was incarcerated for 5 years, 3 months and 11 days—from the ages of 26 to 32—and spent an additional 9 years, 10 months and 5 days on parole as a sex offender, for a crime he did not commit. Mr. Peacock will never be able to get this time of his life back, and his incarceration severely impacted his relationships with his family. He was unable to see his grandfather—with whom he was particularly close—before his death, and could not attend the funeral.

56.     In addition, due to Mr. Peacock's mental illness, his time spent incarcerated was particularly damaging. Other inmates frequently threatened to sexually assault him, he witnessed another inmate's murder and was terrified of being wrongfully connected with that crime as well,

and he was repeatedly hospitalized in secure mental health facilities due to psychotic breaks. Even there, he was not kept safe from violence from other inmates: he was jumped by other inmates and was seriously injured during one period of mental health commitment.

57. These injuries did not stop with his discharge from parole. Mr. Peacock lived the next 18 years of his life with a serious criminal record showing a rape conviction before ultimately clearing his name. He had to grapple with this status, and many family members refused to allow their children to spend time with him.

58. Mr. Peacock's mental health records demonstrate how the wrongful conviction has been particularly damaging to him. Due to his mental illness, he was less capable than others may have been of understanding his situation and why he had been accused of a crime he did not commit. He has thus lived with a profound fear that this could happen to him again, at any time. For example, in March 2003, Mr. Peacock was hospitalized with self-reported suicidal feelings after he was "saw a woman getting out of a car [and] became fearful he would be let up for being accused of rape." And in May 1988, Mr. Peacock was arrested and hospitalized at Rochester Psychiatric Center after he was found placing trash cans in the middle of the street because he was "angry at the judicial system" for sentencing him to 20 years for a rape he did not commit. The wrongful conviction has exacerbated his schizophrenia and mental illness: he repeatedly struggles with feelings of anger, bitterness, helplessness and lack of control stemming from his unjust imprisonment and conviction.

59. The unlawful, intentional, willful, deliberately indifferent, reckless and/or bad faith acts and omissions of Defendants caused Freddie Peacock the following damages, which continue to date and will continue into the future: personal injuries; pain and suffering; severe mental anguish; emotional distress; extreme fear; loss of family relationships; severe

psychological damage; legal expenses; loss of income and earning capacity; infliction of physical injury and physical sickness; inadequate medical care; inadequate dental care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological and social development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunities, vocational opportunities, personal fulfillment, voluntary sexual activity, family relationships, reading, television, movies, travel, enjoyment and expression, for which he is entitled to monetary relief.

## FEDERAL CLAIMS

### COUNT I

**29 U.S.C. § 794, Section 504 of the Rehabilitation Act of 1973,**
**Against the City of Rochester**

60.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

61.     Plaintiff suffers from a mental impairment, including without limitation paranoid schizophrenia, that substantially limits one or more of his major life activities, including without limitation: caring for one's self, working, learning, and sleeping.

62.     Upon information and belief, the City of Rochester is an entity receiving federal funds as defined by the Rehabilitation Act, and was receiving federal funds during the relevant time period covered by this complaint.

63.     Defendant Officers Wernsdorfer, Markel, Irving, Fowler, and John Doe Police Officer arrested and interrogated Mr. Peacock in the course of their investigation of the rape of J.W., while employed by the Rochester Police Department, a subdivision of the City of Rochester. Arrests, interrogation and investigation are services, activities, and/or benefits of a

city's police department that are covered by the Rehabilitation Act.

64.     With knowledge of Mr. Peacock's serious mental illness, the Defendant Officers discriminated against him by reason of that disability. Defendant Officers intentionally, or with deliberate indifference, exploited Mr. Peacock's mental illness by making false promises that he would go to the hospital instead of jail if he were to confess, fabricating an admission that he had raped J.W., and fabricating statements that corroborated the false admission such as the allegation that Mr. Peacock was not taking medication and had urges to do bad things, such as watch girls, when he was not taking his medication.

65.     Defendants Officers' fabrications and coercion caused Mr. Peacock's wrongful conviction for the rape of J.W., and the continuing injuries and damages set forth above.

## COUNT II

### 42 U.S.C. § 1983 Claim in Violation of Mr. Peacock's Rights to a Fair Trial and Against Self-Incrimination

66.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

67.     Defendant Officers, acting individually and in concert, deliberately fabricated inculpatory evidence against Mr. Peacock, and withheld material exculpatory and impeachment evidence from prosecutors, thereby depriving him of his clearly established constitutional rights under the Fifth, Sixth and Fourteenth Amendment of the United States Constitution, including but not limited to his right to a fair trial, his right not to be deprived of liberty as a result of the fabrication of evidence by a government investigator, and his right not to be deprived of liberty without due process of law.

68.     Defendant Officers deliberately fabricated evidence, including allegedly inculpatory statements made by Mr. Peacock during his interrogation, and repeatedly and

consistently misrepresented to prosecutors that those statements had originated with Mr. Peacock. This fabrication was used against Mr. Peacock to cause his conviction.

69.    Defendant Officers also suppressed material exculpatory and impeachment information from the prosecution and defense, including without limitation the fact that the interrogating Defendants fabricated Mr. Peacock's confession and misreported that the incriminating statements had originated with Mr. Peacock, and that unduly suggestive identification procedures and/or direct suggestion had been used to obtain J.W.'s identification of Mr. Peacock.

70.    Mr. Peacock was in the Defendant Officers' custody during the interrogation. A reasonable person in Mr. Peacock's position would have perceived his freedom to be significantly restricted and would not have understood himself to be free to leave.

71.    Defendant Officers' coercion and manipulation was designed to overbear Mr. Peacock's will. Mr. Peacock's fabricated confession was used before the grand jury, during pretrial hearings, and at trial.

72.    The Defendant Officers performed the above-described acts under color of state law, deliberately, recklessly and with deliberate indifference or reckless disregard for Mr. Peacock's constitutional rights and innocence. No reasonable officer in 1976 would have believed this conduct was lawful.

73.    As a direct and proximate result of Defendants' actions Mr. Peacock was indicted, tried, wrongly convicted and imprisoned, deprived of post-conviction mechanisms of relief, and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT III

**42 U.S.C. § 1983 Fourth and Fourteenth Amendment Claim for Malicious Prosecution and Failure to Investigate Available Exculpatory Evidence, Under *Russo v. City of Bridgeport***

74.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

75.     Defendant Officers, with malice and without probable cause to prosecute Freddie Peacock for the rape of J.W., acting individually and in concert, caused Mr. Peacock to be arrested, charged, and prosecuted for that crime, thereby violating Mr. Peacock's clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures.

76.     Defendant Officers, with malice and without probable cause to prosecute Freddie Peacock for the rape of J.W., acting individually and in concert, caused Mr. Peacock to be arrested, charged, and prosecuted for that crime. Furthermore, the Defendants' misconduct throughout the investigation vitiated any probable cause to prosecute Mr. Peacock: the defendants intentionally and knowingly deliberately misrepresented the truth and withheld exculpatory facts from prosecutors and the grand jury, including that they fabricated an admission from Mr. Peacock, manipulated and attempted to coerce him into making false inculpatory statements, and that they used unduly suggestive identification procedures and/or direct suggestion to obtain the identification of Mr. Peacock; acted in bad faith; failed to make a complete and full statement of facts to the District Attorney; misrepresented or falsified evidence; deviated so egregiously from acceptable police practices as to demonstrate intentional or reckless disregard for proper procedures; and they failed to investigate other leads when a reasonable person would have done so—including exculpatory evidence that would have

19

confirmed Mr. Peacock's innocence such as, for example, interviewing his neighbors—or conduct a constitutionally adequate investigation.

77.     The Defendant Officers performed the above-described acts under color of state law, deliberately, intentionally, with malice or reckless disregard for the truth and Mr. Peacock's rights.

78.     Defendant Officers initiated and continued the prosecution against Mr. Peacock without probable cause, in violation of Mr. Peacock's clearly established constitutional rights. No reasonable officer in 1976 would have believed this conduct was lawful.

79.     As Mr. Peacock maintained for over 33 years, he is innocent of J.W.'s rape.

80.     The prosecution finally terminated in Mr. Peacock's favor on February 4, 2010, when his conviction was vacated and his indictment was dismissed.

81.     As a direct and proximate result of defendants' conduct, Mr. Peacock was maliciously prosecuted, wrongly convicted and imprisoned, and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT IV

### 42 U.S.C. § 1983 Civil Rights Conspiracy

82.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

83.     Defendant Officers, acting within the scope of their employment and under color of state law, agreed among themselves and with others to act in concert in order to deprive Mr. Peacock of his clearly established Fourth, Fifth, Sixth, and Fourteenth Amendment rights to be free from malicious prosecution, fabrication of evidence, coercion and deprivation of liberty without due process of law, and to a fair trial. No reasonable officer in 1976 would have believed

this conduct was lawful.

84. In furtherance of the conspiracy each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

a. Defendant Wernsdorfer deliberately fabricated inculpatory evidence, including without limitation that Mr. Peacock had admitted to raping J.W.; falsified reports and other accounts of the interrogation of Mr. Peacock; and failed to document and disclose material exculpatory evidence to prosecutors, including the fact that Mr. Peacock never admitted to raping J.W.;

b. Defendants Markel and Irving were present for the interrogation of Mr. Peacock and, alongside Defendant Wernsdorfer, attempted to coerce and fabricated a statement falsely attributed to Mr. Peacock confessing to the rape of J.W.;

c. Defendant Fowler misrepresented the circumstances surrounding J.W.'s identification of Mr. Peacock as her rapist, and misrepresented that identification to the other officers;

d. Defendant John Doe Police Officer failed to disclose material exculpatory evidence to prosecutors, including the fact that Mr. Peacock never admitted to raping J.W.;

e. Defendants Wernsdorfer, Markel, Irving, Fowler, and John Doe Police Officer deliberately misrepresented the overt acts described in (a), (b), (c), and (d), in written reports and other official pretrial communications with prosecutors.

85. As a direct and proximate result of defendants' actions Mr. Peacock was wrongly convicted and imprisoned and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT V

### 42 U.S.C. § 1983 Failure to Intercede

86.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and further alleges as follows:

87.     By their conduct and under color of state law, Defendant Officers Wernsdorfer, Markel, Irving, Fowler, and John Doe Police Officer had opportunities to intercede on behalf of Mr. Peacock to prevent his malicious prosecution, violation of his right to a fair trial, and violation of his right to be free from unlawful and prolonged seizure, right to be free from fabrication of evidence, coercion and deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

88.     The Defendant Officers' failure to intercede violated Mr. Peacock's clearly established constitutional rights under the Fourth, Fifth, Sixth and Fourteenth Amendments. No reasonable officer in 1976 would have believed that failing to intercede to prevent the defendants from fabricating inculpatory evidence, conducting unduly suggestive identification procedures and/or using direct suggestion to procure identifications, withholding and/or destroying material, exculpatory evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Peacock to be arrested and prosecuted without probable cause was lawful.

89.     As Mr. Peacock has maintained for over 33 years, he is innocent of J.W.'s rape. The prosecution terminated in Mr. Peacock's favor on February 4, 2010, when his conviction was vacated and his indictment was dismissed.

90.     As a direct and proximate result of defendants' failure to intercede, Mr. Peacock was wrongly convicted and imprisoned and suffered the other grievous and continuing damages

and injuries set forth above.

## STATE LAW CLAIMS

## COUNT VI

### Malicious Prosecution

91.     Plaintiff hereby incorporates by reference all of the foregoing paragraphs and
further alleges as follows:

92.     Defendant Officers, with malice and without probable cause to prosecute Freddie
Peacock for the rape of J.W., acting individually and in concert, caused Mr. Peacock to be
arrested, charged, and prosecuted for that crime. Furthermore, the Defendants' misconduct
throughout the investigation vitiated any probable cause to prosecute Mr. Peacock: the
defendants intentionally and knowingly deliberately misrepresented the truth and withheld
exculpatory facts from prosecutors and the grand jury, including that they fabricated an
admission from Mr. Peacock, manipulated and attempted to coerce him into making false
inculpatory statements, and that they used unduly suggestive identification procedures and/or
direct suggestion to obtain the identification of Mr. Peacock; acted in bad faith; failed to make a
complete and full statement of facts to the District Attorney; misrepresented or falsified
evidence; deviated so egregiously from acceptable police practices as to demonstrate intentional
or reckless disregard for proper procedures; and they failed to investigate other leads when a
reasonable person would have done so—including exculpatory evidence that would have
confirmed Mr. Peacock's innocence such as, for example, interviewing his neighbors—or
conduct a constitutionally adequate investigation.

93.     The Defendant Officers performed the above-described acts under color of state
law, deliberately, intentionally, with malice or reckless disregard for the truth and Mr. Peacock's

rights.

94.     In committing the acts alleged in the preceding paragraphs, the Defendant Officers were members of and agents of the Rochester Police Department, acting within the scope of their employment and under color of law. Defendant City of Rochester is liable as principal for all torts committed by its agents under the theory of respondeat superior.

95.     Defendants initiated and continued the prosecution against Mr. Peacock without probable cause, in violation of Mr. Peacock's clearly established constitutional rights. No reasonable officer in 1976 would have believed this conduct was lawful.

96.     As Mr. Peacock maintained for over 33 years, he is innocent of J.W.'s rape.

97.     The prosecution finally terminated in Mr. Peacock's favor on February 4, 2010, when his conviction was vacated and his indictment was dismissed.

98.     As a direct and proximate result of defendants' conduct, Mr. Peacock was maliciously prosecuted, wrongly convicted and imprisoned, and suffered the other grievous and continuing damages and injuries set forth above.

WHEREFORE, Plaintiff Freddie Peacock respectfully requests that this Court enter judgment in his favor and against Defendants and award:

A. compensatory damages to him and against the Defendants, jointly and severally, in an amount to be determined at trial;

B. punitive damages to him, and against all individual Defendants, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

C. pre-judgment and post-judgment interest and recovery of his costs, including

reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

D. any and all other relief to which he may be entitled.

## JURY DEMAND

Plaintiff Freddie Peacock hereby demands a trial by jury pursuant to the Seventh Amendment of

the United States Constitution and Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: January 31, 2013

Respectfully submitted,

Peter Neufeld
Nick Brustin
NEUFELD SCHECK & BRUSTIN, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
(212) 965-9081

Donald M. Thompson
EASTON THOMPSON KASPEREK SHIFFRIN, LLP
16 West Main Street, Suite 243
Rochester, New York 14614
(585) 423-8290

**Attorneys for Plaintiff Freddie Peacock**