UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

FREDDIE PEACOCK,

                                    Plaintiff,

          -vs-

CITY OF ROCHESTER; WAYNE MARKEL; ROY
IRVING; DEBORAH FOWLER; JOHN J.
WERNSDORFER; SANDRA J. WERNSDORFER,
SOLELY AS ADMINISTRATRIX AND
FIDUCIARY OF THE ESTATE OF JOHN J.
WERNSDORFER; and JOHN DOE POLICE
OFFICER;

                                    Defendants.

_____

**No. 6:13-cv-6046-MAT**
**DECISION AND ORDER**

## INTRODUCTION

Represented by counsel, Freddie Peacock ("Plaintiff") instituted this action against the City of Rochester ("the City"); and Rochester Police Department Officers Wayne Markel, Roy Irving, Deborah Fowler, John J. Wernsdorfer, and John Doe Police Officer (collectively, "Defendants"). Plaintiff alleges violations of his civil rights based on his 1976 arrest, prosecution, and conviction on a charge of first-degree rape, of which he was exonerated in 2008 through DNA testing. In his Complaint (Dkt #1), Plaintiff asserts a claim under 29 U.S.C. § 794, Section 504 of the Rehabilitation Act of 1973, against the City of Rochester (Count I); a claim under the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983") based on the denial of his right to a fair

trial and violation of his privilege against self-incrimination (Count II); a claim for malicious prosecution and the failure to investigate exculpatory evidence under Section 1983 and the Fourth and Fourteenth Amendments of the United States Constitution (Count III); a conspiracy claim under Section 1983 (Count IV); a failure to intercede claim under Section 1983 (Count V); and a claim for malicious prosecution under New York State law (Count VI).

### FACTUAL BACKGROUND[1] AND PROCEDURAL HISTORY

In July of 1976, Plaintiff, then 26 years-old, resided at an apartment located at 47 Troup Street in the City of Rochester. Despite suffering from a major mental illness most often diagnosed as paranoid schizophrenia, and undergoing several in-patient hospitalizations, Plaintiff was able to be high-functioning by taking his prescribed medications: Plaintiff worked full-time as a hotel cook, supported himself, lived independently, and maintained multiple friendships.

J.W., a female, also resided in Plaintiff's apartment building. Plaintiff had interacted with J.W. on several occasions before July 23, 1976.

At approximately 2:10 a.m. on July 23, 1976, J.W. was walking from her car to the entrance of 47 Troup Street. As she was about to unlock the door, she was grabbed from behind by a man who put

---

[1]

The facts in this section have been set forth in the light most favorable to Plaintiff, with all disputes resolved, and all inferences drawn, in his favor.

one hand over her forehead and one over her mouth. J.W. screamed, and the assailant forced her to the ground and knocked the side of her head on the concrete. He threatened to kill her if she screamed again. A light came on in the apartment building, and the attacker dragged J.W. to the unlit side of the building and threatened to stab her if she screamed. He then dragged J.W. to a nearby building where he pulled down her pants and underwear, dropped her to the ground and vaginally raped her, ejaculating. He ordered J.W. not to call the police and, when she agreed, he let her go and fled the area. J.W. ran to the apartment of the building's superintendent, Erroll Hillary ("Hillary"), and reported she had been raped. Hillary asked J.W. repeatedly if she knew who had done this to her. However, J.W. did not identify anyone or give Hillary any description of her rapist, or state that she knew the person who had raped her. Hillary took J.W. upstairs to her apartment and called the police.

Officer Wayne Markel ("Markel") of the Rochester Police Department ("RPD") was the first on the scene and interviewed J.W., who was still crying and hysterical. She initially described her assailant only as a black male of medium height. Markel understood from his interview at the scene that J.W. had been raped by a stranger—which would eliminate her neighbor, Plaintiff, from suspicion.

After J.W. was taken to the hospital, Officer Deborah Fowler ("Fowler") of the RPD met with J.W. alone. Fowler testified at her deposition that while she did not remember creating a report of this interview, she was required to complete such a report by RPD rules and regulations. Fowler also testified at her deposition, some 38 years after the incident, that J.W. immediately had identified Plaintiff, by name, as the rapist. By contrast, J.W. testified at the Wade hearing in 1976 that she did not tell Fowler the identity of the perpetrator. Fowler's report is missing from the RPD's and prosecutor's files, and she has no idea what happened to it.

Shortly after Fowler interviewed J.W., Detective John J. Wernsdorfer ("Wernsdorfer") provided J.W. with "a bunch of pictures" containing Plaintiff's photograph. When J.W. reached Plaintiff's picture, she held it in her hand while continuing to look through the rest. After viewing the whole sheaf of photos, Wernsdorfer reported that J.W. identified Plaintiff, although the exact words she used and certainty of her identification (e.g., whether it was tentative or positive) were not recorded by Wernsdorfer or anyone else.

At about 4:30 a.m., Markel and Wernsdorfer went to Plaintiff's apartment, where he was asleep, having worked a double-shift at work until 10 p.m.  The officers were aware of Plaintiff's history of serious mental illness and his hospitalizations. At the time he

-4-

was brought in for questioning, Plaintiff was not displaying any psychiatric symptoms. In fact, he was working full-time as a cook at the Ramada Inn and had been working double shifts from 7 a.m. to 10 p.m. for the past 5 months, something he would have been unable to do if he were not taking his medications.

Back at the police station, Plaintiff reported that the officers did not read him his Miranda warnings but simply placed a card with the warnings printed on it in front of him. They then questioned him aggressively, demanding to know "why" he had raped J.W. According to Plaintiff, Markel promised him that if he just confessed, he could go to the hospital instead of jail.

Sometime after 7 a.m. on July 23, 1976, Wernsdorfer typed up a document called an "oral synopsis," which he claimed contained most of the statements Plaintiff made regarding the rape. According to Wernsdorfer's oral synopsis, Plaintiff repeatedly made such admissions as "I did it," "I raped her, I raped the girl," "I was sick," and "It's the only thing I can say." Plaintiff's Exhibit ("Pl's Ex.") P (Dkt #103-16). In addition, Plaintiff allegedly said that he "could not remember the details of the rape, but that he knows that he did rape her, because when he gets that urge, he knows he cannot control himself." Id. Plaintiff consistently and repeatedly has denied any involvement in or knowledge of the rape, and has denied making any of the statements attributed to him by

Wernsdorfer.[2] The oral synopsis was forwarded to the prosecutor handling the case for the Monroe County District Attorney's Office ("MCDAO"), who relied on it in presenting the matter to the grand jury. A one-count indictment was returned against Plaintiff, charging him with first-degree rape.

At trial in December of 1976, Wernsdorfer testified that Plaintiff had spontaneously repeatedly confessed to the rape. Plaintiff presented an alibi defense through his neighbor, Ida Mae Hill ("Hill"), whose apartment shared a wall with Plaintiff's apartment. According to Hill, Plaintiff was at home listening to the stereo when she arrived home at 12:05 a.m.; she heard him pull his hide-a-bed down from the wall and heard the springs creak as he climbed into it. At 2:30 a.m., Hill heard J.W. come inside the house, screaming. Prior to and after 2:30 a.m., Hill did not hear any sounds from Plaintiff's apartment. After a 3-day trial, the jury returned a verdict finding Plaintiff guilty as charged in the indictment. He was sentenced to an indeterminate term of up to 20 years in prison. After serving 5 years and 9 months, he was conditionally released and served approximately 10 years on parole. He was discharged from parole on March 19, 1992.

---

[2]

Markel, who was present for much of the interrogation, admitted in his 2014 deposition that he never heard Plaintiff make these or any other admissions regarding the crime. Pl's Ex. D (Dkt #103-4), Markel Deposition Transcript ("Markel Dep."), pp. 70-73, 78-79, 84, 131.

On January 11, 2008, with the help of The Innocence Project, Plaintiff filed a successful post-conviction motion for DNA testing on biological evidence obtained during the investigation of J.W.'s rape. The test results identified a single male DNA profile in the sperm fraction deposited on the underwear worn by the victim during the attack. Plaintiff was definitively excluded as the source of the DNA profile. Based on the DNA testing, Plaintiff and the MCDAO filed a joint motion to vacate his conviction and dismiss the indictment, which was granted on February 4, 2010.

Plaintiff commenced the instant lawsuit by filing his Complaint on January 31, 2013. Following extensive discovery, on December 2, 2015, the Court (Feldman, M.J.) issued an order directing that dispositive motions be filed by January 31, 2016. Defendants[3] filed the instant motion for summary judgment (Dkt #91) on January 26, 2016, and also moved for leave to amend their answer to add a statute of limitations defense. Plaintiff has opposed both motions (Dkt ##102, 103). Defendants filed a Reply (Dkt #107). Plaintiff was granted permission to file a Sur-Reply (Dkt #109-3), and Defendants were granted permission to file a Sur-Sur-Reply (Dkt #112). The matter is now fully submitted and ready for decision.

---

[3] Wernsdorfer is deceased, and the administratrix of his estate has been substituted as a party. Fowler was voluntarily dismissed by Plaintiff as a defendant on March 24, 2015.

For the reasons discussed below, Defendants' Motion for Summary Judgment (Dkt #91) is granted in part and denied in part. Defendants' Motion to Amend the Answer (Dkt #91) is denied with prejudice.

## DEFENDANTS' MOTION TO AMEND

Defendants seek to amend their Answer to interpose a statute of limitations defense. It is beyond dispute that the statute of limitations is an affirmative defense under Federal Rule of Civil Procedure ("F.R.C.P.") 8(c) "that must be asserted in a party's responsive pleading 'at the earliest possible moment' and is a personal defense that is waived if not promptly pleaded." Id. (quoting Santos v. District Council, 619 F.2d 963, 967 n. 5 (2d Cir. 1980); other citations omitted).

Defendants filed their Answer (Dkt #4) on June 17, 2013. The Court (Feldman, M.J.) issued a Scheduling Order (Dkt #9) on August 15, 2013, setting a deadline of September 27, 2013, for any motions to join parties or amend pleadings. Discovery closed on June 27, 2014. Defendants, however, did not move for leave to amend their Answer until January 26, 2016, when they filed the instant Motion for Summary Judgment. This amounts to a delay of 851 days (i.e., 2 years, 3 months, and 30 days, excluding the end date), between the Court-imposed deadline for the amendment of pleadings and Defendants' request for leave to amend.

In support of their request to amend, Defendants rely on F.R.C.P. 15(a) ("Rule 15(a)"), which "requires courts to grant leave 'freely . . . where justice so requires[.]" Parker v. Columbia Pictures Indus., 204 F.3d 326, 339 (2d Cir. 2000) (quotation and citation omitted; ellipsis in original). The Second Circuit has "held repeatedly that 'mere delay' is not, of itself, sufficient to justify denial of a Rule 15(a) motion[.]" Id. However, as Plaintiff points out, F.R.C.P. 16(b) ("Rule 16(b)") is also at play here, because a scheduling order was in place. See Parker, 204 F.3d at 339 ("According to Rule 16(b), within 90 days after the appearance of the defendant and within 120 days of the service of a complaint on a defendant, the district court *shall enter* a scheduling order setting deadlines for subsequent proceedings in the case, including joinder of parties and amendments to the pleadings.") (emphasis supplied).

In contrast, Rule 16(b) provides that "scheduling orders 'shall not be modified except upon a showing of good cause.'" Id. at 340. This "requirement ensur[es] [that] 'at some point both the parties and the pleadings will be fixed.'" Id. (quoting FED. R. CIV. P. 16(b); FED. R. CIV. P. 16 advisory committee's note (1983 amendment, discussion of subsection (b)). The showing of "good cause" "depends on the diligence of the moving party." Id. (citations omitted). Thus, "[t]here is an obvious tension between Rules 15(a) and 16(b)." Fresh Del Monte Produce, Inc. v.

<u>Del Monte Foods, Inc.</u>, 304 F.R.D. 170, 175 (S.D.N.Y. 2014) (citing, <u>inter alia</u>, <u>Alioto v. Town of Lisbon</u>, 651 F.3d 715, 719 (7th Cir. 2011)). While Rule 15(a) directs the court to grant leave to amend "freely[,]" FED. R. CIV. P. 15(a), Rule 16(b) precludes a court from amending a scheduling order in the absence of a showing of "good cause[,]" FED. R. CIV. P. 16(b). <u>E.g.</u>, <u>Alioto</u>, 651 F.3d at 719. The Second Circuit has noted this tension and has joined the majority of its sister circuits in holding that "once the pretrial scheduling order's deadline for filing motions to amend the pleadings has passed, a party must, under Rule 16(b), demonstrate 'good cause' for its failure to comply with the scheduling order before the trial court can consider, under Rule 15(a), the party's motion to amend its pleading." <u>Chancellor v. Pottsgrove Sch. Dist.</u>, 501 F. Supp.2d 695, 701 (E.D. Pa. 2007) (collecting cases, including <u>Parker</u>, 204 F.3d at 340; discussing tension between Rule 15(a) and Rule 16(b)).

Defendants did not attempt to demonstrate "good cause" in their Motion to Amend, asserting only that Plaintiff would not be prejudiced by the belated amendment. However, because Defendants failed to comply with the Court's scheduling order setting the deadline for the amendment of pleadings, they are required to demonstrate "good cause" for their belated request. See <u>Parker</u>, 204 F.3d at 339-40.

The Court agrees that Defendants are unable to demonstrate "good cause." First and foremost, Defendants were aware of the facts and the law giving raise to their statute of limitations defense at the time Plaintiff instituted this action. Plaintiff's Complaint contained a general chronology of his arrest, conviction, release from prison, discharge from parole supervision, motion for DNA testing, and vacatur of his conviction based on the DNA test results—in short, all of the facts necessary for Defendants to determine the accrual date or dates of Plaintiff's various causes of action.

Defendants assert that their statute of limitations argument is "based upon the subtle and complex interplay of the majority and concurring Supreme Court opinions [in] Heck v. Humphrey, 512 U.S. 477 (1994), and Second Circuit jurisprudence developing those opinions[,]" Defs' Reply at 3, and the purported "novelty" of the application of these legal principles to the present case. Id. The Court disagrees for several reasons, the most obvious of which is that the case on which Defendants purport to rely, Poventud v. City of N.Y., 715 F.3d 57 (2d Cir. 2013), is no longer good law, and has not been good law for several years. The Second Circuit issued this decision on April 13, 2013, but weeks later granted rehearing en banc, and issued a superseding opinion on January 16, 2014, see Poventud v. City of N.Y., 750 F.3d 121 (2d Cir. 2014) (en banc). The en banc opinion not only decided the case on a different

ground, it expressly did not adopt the position urged by Defendants here. The Court finds Defendants' argument that they have demonstrated good cause based on the alleged novelty and complexity of the law to be unavailing.

Next, Defendants assert, for the first time in their Reply, that they demonstrated "diligence" by raising the affirmative defense of failure to state a claim in their Answer, and thereby preserved their statute of limitations defense. As an initial matter, it is well settled that "[i]ssues raised for the first time in a reply brief are generally deemed waived." Connecticut Bar Ass'n v. United States, 620 F.3d 81, 91 n.13 (2d Cir. 2010) (citation omitted). Even overlooking Defendants' waiver of this argument due to its belated assertion in the Reply, the Court finds that it is without merit. The only case from this Circuit cited in support by Defendants is a 27-year-old district court decision[4] which in turn cites no authority for the proposition that the defense of failure to state claim includes a statute of limitations defense. The other case cited by Defendants, Sanders v. Dep't of Army, 981 F.2d 990 (8th Cir. 1992) (per curiam), did not hold that a statute of limitations defense is preserved by the assertion of a defense based on the failure to state claim, but merely stated

---

[4]

    See Livshits v. Natural Y Surgical Specialities, Inc., No 887 Civ. 2403(KMW), 1989 WL 116428, at *1 (S.D.N.Y. Sept. 25, 1999) ("Plaintiff argues that defendant waived any defense based on the statute of limitations by failing to plead it as an affirmative defense in its answer. This argument is unavailing because defendant pled the affirmative defense of failure to state a claim, which includes a defense based on the statute of limitations.").

that "*[e]ven if* [5 U.S.C.] § 7703(b)(2) *is* a statute of limitations, *it is arguable* that the failure to state a claim defense in the government's answer preserved the limitations defense." Id. at 991 (emphases supplied). The Court declines to find either of these cases persuasive or binding upon it.

In opposition, Plaintiff has cited a Second Circuit decision, Davis v. Bryan, 810 F.3d 42 (2d Cir. 1987), in which the Circuit reversed the district court's decision dismissing the plaintiff's claim as time-barred, based on the defendants' pre-answer "motion to dismiss, which was based on a claimed failure to state a cause of action[,]" Id. at 44-45. The Second Circuit held that was error, because the motion to dismiss, notwithstanding its assertion that the plaintiff failed to state a claim, "did not assert the affirmative defense of statute of limitations[,]" id. Davis thus supports the proposition that the statute of limitations defense is *not* implicit in an asserted defense of failure to state a claim.

In sum, the Court finds that Defendants have not demonstrated good cause for their belated assertion of the statute of limitations defense with regard to Plaintiff's various causes of action. Defendants had in their possession all of the information they needed at the outset of this litigation in order to formulate and assert a statute of limitations defense. "[A] party is presumptively not diligent if, at the commencement of the lawsuit, the party knows or is in possession of the information that is the

basis for that party's later motion to amend." <u>Chancellor</u>, 501 F. Supp.2d at 702 (citing <u>S & W Enters., L.L.C. v. SouthTrust Bank of Ala., NA</u>, 315 F.3d 533, 536 (5th Cir. 2003)). Without diligence, there can be no "good cause." <u>Id.</u> Therefore, the Court declines to exercise its discretion to permit the amendment of Defendants' Answer. <u>See</u>, <u>e.g.</u>, <u>Parker</u>, 204 F.3d at 341 (affirming the district court's denial of plaintiff's motion to amend for lack of "good cause" because the plaintiff possessed all the information he needed to support a breach of contract claim before he filed suit, "and nothing he learned in discovery or otherwise altered that fact").

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.    Preliminary Matters

In his Memorandum of Law, Plaintiff states that he voluntarily dismisses all claims against Fowler, Roy Irving, and John Doe Police Officer. <u>See</u> Pl's Mem. (Dkt #102) at 1, n. 1. Plaintiff also is voluntarily dismissing the following: his claims under the Rehabilitation Act (Count I); claims for violations of the right against self-incrimination (Count II, in part); claims for the failure to investigate (Count III, in part); and claims for malicious prosecution under New York State law (Count VI). <u>See</u> <u>id.</u>

## II.   General Legal Principles

Summary judgment is only appropriate in cases where "there is no genuine issue as to any material fact and . . . the moving party

is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The moving party bears the burden of establishing that no genuine factual dispute exists. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). In assessing the record to determine whether there is a genuine issue as to a material fact, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citation omitted). The Supreme Court has made clear that "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.

## II.  Analysis

### A.  Denial of Right to a Fair Trial

Plaintiff argues that his due process right to a fundamentally fair trial was violated by Wernsdorfer's fabrication of evidence, namely, Plaintiff's alleged confession to the rape. Plaintiff also asserts a violation of due process right based on the prosecution's withholding of exculpatory evidence.

#### 1.  The Fabricated Confession

The Second Circuit has held that "'[w]hen a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by

such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983.'" <u>Jocks v. Tavernier</u>, 316 F.3d 128, 138 (2d Cir. 2003) (holding that the trial court, in dismissing the malicious prosecution claim against a police detective who fabricated evidence against the plaintiff-arrestee, erroneously rejected the argument that the fabrication of evidence is a civil rights violation) (quoting <u>Ricciuti v. N.Y.C. Transit Auth.</u>, 124 F.3d 123, 130 (2d Cir. 1997); alteration in original).

In the Section 1983 context, a constitutional violation based on the denial of a fair trial occurs when "an (1) investigating official (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of liberty as a result." <u>Jovanovic v. City of N.Y.</u>, 486 F. App'x 149, 152, 2012 WL 2331171, at *2 (2d Cir. 2012) (unpublished opn.) (citations omitted). Wernsdorfer, as the lead police officer involved in interrogating Plaintiff on the night of the crime, is an "investigating official" for purposes of the first element.

With regard to the fabrication element, the Court finds that the record permits a reasonable jury to conclude that Wernsdorfer concocted Plaintiff's confession out of whole cloth. Plaintiff consistently has testified that he did not commit the rape and has denied ever confessing to the police, instead explaining that he merely was asked by the officer to sign a blank statement form

(which he declined to do). Moreover, Plaintiff's protestations of innocence ultimately were borne out by the DNA test results. Wernsdorfer, on the other hand, testified that Plaintiff spontaneously and repeatedly confessed to the rape after about 20 to 30 minutes of non-aggressive interrogation. Although Wernsdorfer's and Plainiff's discrepant versions of the interrogation, standing alone, give rise to a genuine issue of material fact, there is additional evidence that could lead a reasonable jury to find that Wernsdorfer fabricated the confession. Wernsdorfer's colleague, Markel, has conceded under oath that Plaintiff never made any admissions during the interrogation. While Markel claims ignorance of the existence of Plaintiff's purported confession until he was deposed in this matter, a reasonable jury could find this unworthy of belief, given Markel's direct participation in the investigation, interrogation, and prosecution. Furthermore, there were procedural irregularities in Wernsdorfer's "recording" of the confession. Although the RPD's well-established policy and practice calls for, whenever possible, a stenographically recorded confession or a statement written out and signed by the subject, the "oral synopsis" of Plaintiff's confession, to which Wernsdorfer testified, was written out by Wernsdorfer himself and *not* signed by Plaintiff. Notably, there is no suggestion that Plaintiff was uncooperative or incapacitated during the interrogation, and either unwilling or unable to sign a

confession. Wernsdorfer testified that despite the department's general policy and his own usual practice, he thought it was unnecessary to have Plaintiff write out and sign his own statement. A reasonable jury easily could disbelieve Werner's proffered explanation for not, at a minimum, obtaining Plaintiff's signature on the oral synopsis.

With regard to the third element, Plaintiff has easily raised a genuine issue of material fact as to whether the fabricated evidence was likely to influence a jury's decision. Markel has admitted that, due to the weakness of the victim's identification of her assailant, he and Wernsdorfer recognized that it would be especially important to obtain a confession. The prosecutor argued in summation that the confession provided compelling proof of Plaintiff's guilt and demonstrated motive. See Plaintiff's Counter-Statement of Facts ("Pl's CSOF") (Dkt #102-1) ¶¶ 57-58 (citations omitted). The prosecutor described the victim as a "hysterical woman who couldn't see because it [was] dark out" and reassured the jurors they "do not have to count on [her] testimony alone[.]" Id. ¶ 57 (citations omitted). A reasonable jury also could find that the false confession effectively bolstered the victim's erroneous identification of Plaintiff as her assailant. As noted above, the victim did not identify Plaintiff initially, although she was acquainted with him. See Pl's CSOF ¶¶ 62-65 (citations omitted). Indeed, Markel, who took the first statement from the victim,

understood her to be describing a rape by a stranger. Id. ¶ 62 (citations omitted). When Markel re-interviewed the victim later at the hospital, she was calmer, but still did not offer any more specific information about the identity of the rapist. Nor did the victim mention knowing him or suggest the rapist might have been Plaintiff. Id. ¶ 66 (citations omitted).[5] However, following Wernsdorfer's announcement that Plaintiff had confessed, the victim began expressing certainty in her identification of Plaintiff as the rapist, and relating new, never-before reported details about her attacker. For instance, when Markel first interviewed the victim, she could only describe the perpetrator as being a black male of medium height. Pl's CSOF ¶¶ 65, 91. By the time of the Wade hearing, the victim claimed she was able to see the rapist's face, and described him as a black male with facial hair, without an Afro, and without glasses. Id. ¶ 92 (citations omitted). This description matched Plaintiff's appearance at the time of the crime.

The fourth element, whether Wernsdorfer forwarded the fabricated confession to the prosecutor, is established. The record indicates that the prosecutor recalled seeing Wernsdorfer's oral

---

[5]

Plaintiff has submitted evidence that he always has had a very distinctive, high-pitched voice. Pl's CSOF ¶ 68 (citations omitted). Markel's report describes several verbal communications between the victim and the rapist during the attack; for instance, the rapist kept saying to her that if she screamed he would kill her. Id. ¶ 67 (citation omitted). However, the victim never mentioned to Markel anything distinctive about the rapist's voice or that she recognized his voice. Id. ¶ 69 (citations omitted).

synopsis, which was attached to the form referring the case to the grand jury. See Pl's CSOF ¶ 54 (citations omitted).

Turning finally to the element of causation, Defendants argue that Plaintiff cannot show that the allegedly fabricated confession caused him any pre-trial deprivation of liberty apart from the fact of the prosecution itself, which Defendants assert was justified by probable cause. This argument is without merit under Second Circuit precedent. In Ricciuti, for example, the Circuit "specifically held that the police had probable cause to arrest but nonetheless reversed the district court's grant of summary judgment on the malicious prosecution claim because there was proof that the officers had later manufactured false evidence" against the Section 1983 plaintiff. Jocks, 316 F.3d at 138 (citing Ricciuti, 124 F.3d at 128, 130); see also Jovanovic, 486 F. App'x at 152 ("Probable cause is not a defense" to a Section 1983 claim alleging the denial of the right to a fair trial.) (citing Ricciuti, 124 F.3d at 129-30)).

Defendants also attack causation by arguing that any post-conviction deprivation of liberty attributable to the allegedly fabricated confession could have been caused only by Wernsdorfer's testimony, as to which Wernsdorfer enjoys absolute immunity.[6] The

---

[6]

See, e.g., Briscoe v. LaHue, 460 U.S. 325, 335-36 (1983) ("When a police officer appears as a witness, he may reasonably be viewed as acting like any other witness sworn to tell the truth—in which event he can make a strong claim to witness immunity; alternatively, he may be regarded as an official performing a critical role in the judicial process, in which event he may seek the benefit

Court disagrees. As noted above, Wernsdorfer forwarded his synopsis of Plaintiff's confession to the prosecutor, who relied on it in securing an indictment against Plaintiff. See Pl's CSOF ¶ 54 (citing Pl's Ex. C (Dkt #103-3), Vanstrydonck Dep., 73:3-7; Pl's Ex. Q (Dkt #103-17), Grand Jury Referral Form). Not only was Wernsdorfer's synopsis appended to the grand jury referral sheet, it was introduced as an exhibit at the Huntley hearing and marked as an exhibit at trial. See Pl's CSOF ¶ 55 (citing Pl's Ex. E (Dkt #105-5), Huntley Tr., 32:8-24). Although the synopsis ultimately was not published to the jury, Wernsdorfer stated, during his testimony, that the document he was holding was "the original copy of the oral synopsis that [he] typed up after talking to Freddie Peacock." Pl's CSOF ¶ 56 (citing Pl's Ex. B (Dkt #103-2), Trial Transcript ("Trial Tr."), pp. 272:1-273:2, 278:2-11, 291:10-292:8)). Under Second Circuit precedent, this factual record is sufficient to preclude a finding in Wernsdorfer's favor on the issue of absolute immunity. See, e.g., Jocks, 316 F.3d at 138 ("Jocks testified that the statement written by Oggeri [the police officer] was false; that it had been edited to favor the police; and that for that reason he refused to sign the statement after Oggeri recorded it. Oggeri testified that the statement was verbatim and accurate, although he did admit that he wrote the statement down fifteen to twenty-five minutes after it had been

afforded to other governmental participants in the same proceeding.") (footnote omitted).

made. *It is undisputed that the statement was passed on to the prosecution.* Although there was certainly not overwhelming evidence of falsification, a reasonable jury would be entitled to credit Jocks's testimony and reject Oggeri's.") (emphasis supplied).

Finally, as a general matter, causation is a factual question for the jury to resolve. See, e.g., Redd v. New York Div'n of Parole, 678 F.3d 166, 178 (2d Cir. 2012) ("Issues of causation . . . are questions of fact."); see also, e.g., Higazy v. Templeton, 505 F.3d 161, 175 (2d Cir. 2007) (finding that genuine issues of material fact existed as to whether FBI agent caused the confession he coerced from arrestee to be used against the arrestee at a bail hearing, and as to whether agent's conduct was the proximate cause of the arrestee's detention; these fact issues precluded summary judgment on arrestee's Bivens claim against agent for violating his Fifth Amendment right against compelled self-incrimination). On this record, it is impossible for the Court to hold as a matter of law that there were superseding causes cutting off Wernsdorfer's liability based on his fabrication of a crucial piece of evidence in Plaintiff's prosecution. Plaintiff's fair trial claim may proceed.

## 2.   Suppression of Evidence Favorable to the Defense

Plaintiff also asserts he was denied a fair trial claim based on the suppression of material evidence having exculpatory and impeachment value. In particular, Plaintiff points to Markel's

belief, after his first interview of the victim, that she was describing an assault by someone she did not know. In addition, Plaintiff cites a report allegedly prepared by Fowler, who interviewed the victim at the hospital. In his Complaint, Plaintiff did not specifically identify the items of evidence that allegedly were withheld. Contrary to Defendants' contention, the Court does not find this to be fatal to his claim. It is undisputed that Plaintiff only became aware of this information during the discovery process and thus could not have framed the Brady claim with more specificity when he filed his Complaint.

Brady v. Maryland, 373 U.S. 83 (1963), states the "well settled rule that the Government's failure to disclose evidence that is materially favorable to the defense violates due process." United States v. Rivas, 377 F.3d 195, 199 (2d Cir. 2004) (citing Brady, 373 U.S. at 87). Brady claims are actionable under Section 1983. See Poventud, 750 F.3d at 132-33, 135-36 (citations omitted). "There are three components of a true Brady violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1995). "To establish prejudice, a plaintiff must show materiality[,]" Poventud, 750 F.3d at 133 (citations omitted),

which requires consideration of the evidence "collectively, not item by item." Kyles v. Whitley, 514 U.S. 419, 436 (1995).

Turning first to the alleged Brady material involving Markel, he admitted that when he first interviewed the victim, he believed she was describing a stranger rape, rather than an attack by someone she knew. Markel testified at his deposition that he personally considered this to be a "red flag" requiring additional investigation. However, Markel did not document this in his report that was turned over to the prosecutor. See Pl's CSOF ¶¶ 89-90. In addition, Markel did not document his concern, based on his experience, that the victim failed to arrive at her identification of Plaintiff as the rapist until later on that night. See id. ¶¶ 70-72. Defendants assert that the underlying facts on which Markel based his "stranger rape" theory were disclosed to the defense during the Wade hearing, an assertion that Plaintiff does not address in his Sur-Reply. As Defendants note, there is no suppression for Brady purposes where, as here, "the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." Leka v. Portuondo, 257 F.3d 89, 100 (2d Cir. 2001) (quotation omitted).

The second alleged Brady item is a report prepared by the former defendant, Fowler, who interviewed the victim at Markel's direction. Plaintiff asserts that the report disappeared without explanation and was never provided to the prosecution or defense.

See Pl's CSOF ¶¶ 74-77, 78-85, 86-90 (citations omitted). Defendants argue that the existence of this report is "rank speculation[,]" Defs' Reply (Dkt #107) at 11, because Fowler admitted, "I don't remember doing one. . . ." Pl's Ex. DD, Fowler Dep. p. 40; see also id. p. 41. However, Fowler also testified at her deposition that after reviewing the police reports, she believed that her report was missing because she "would have written one . . . [about] what [she] did that night." Pl's Ex. DD (Dkt #103-30), Fowler Dep. p. 40. Fowler testified that RPD rules and regulations required her to create a report, and thus she must have prepared a report after talking to the victim. Id. p. 42, p. 84 ("I wrote a report. No, I don't [know what happened to it."). She testified that it was not possible for her to have forgotten to write a report, which "[a]lways" had to be done on the same shift. Id. p. 50, 78.

The Court agrees that the absence of a report by Fowler is suspicious. Defendants argue that assuming that Fowler did write a report, Plaintiff has not established an issue of fact as to whether it would have been favorable to the defense. Fowler testified at her deposition that when she asked the victim for a description, the victim "said she knew who it was, he lived in the building, that she had told her superintendent about this guy. She gave me his name and [Fowler] relayed his name to the other officer." Pl's Ex. DD, Fowler Dep. p. 86. Fowler's testimony is

not helpful to Plaintiff. However, a reasonable jury might decline to credit Fowler's recollection, 38 years after the fact, when presented with the victim's testimony in 1976 at the <u>Wade</u> hearing that she did *not* identify the perpetrator to Fowler during their interview. Indeed, Fowler admitted that if J.W. had identified Plaintiff by name as her attacker, there would have been no need for her to spend time reviewing the photo array she subsequently was shown by Wernsdorfer. The Court will allow this aspect of Plaintiff's <u>Brady</u> claim to proceed.

## C.  Malicious Prosecution under Section 1983

"In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law[.]" <u>Manganiello v. City of N.Y.</u>, 612 F.3d 149, 160-61 (2d Cir. 2010) (internal and other citations omitted). Under New York law, a plaintiff attempting to recover for malicious prosecution must prove "'(1) the initiation or continuation of a criminal proceeding against [him]; (2) termination of the proceeding in [his] favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" <u>Murphy v. Lynn</u>, 118 F.3d 938, 947 (2d Cir. 1997), <u>cert.</u> <u>denied</u>, 522 U.S. 1115 (1998) (quotation omitted). Defendants only contest the third

element, and argue that probable cause existed to commence the criminal proceeding against Plaintiff.

The Second Circuit has explained that "in general '[p]robable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested.'" Manganiello, 612 F.3d at 161 (quotation and citations omitted; alteration in original). Reliance on "mistaken information" is not fatal to a probable cause finding so long as the reliance is "reasonable[.]" Id. However, "'the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" Id. (quotation omitted).  "Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment,' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome." Id. at 162 (quotation omitted).

While it is undisputed that, as Defendants claim, the victim identified Plaintiff as the rapist within hours of the attack, consideration of the facts in the light most favorable to Plaintiff casts doubt on the existence of probable cause. The attack occurred

at 2:10 a.m. and, according to Markel, the first officer on the scene, it was very dark on the side of the building where he found the victim's purse and shoes (the location where she was seized by the rapist) because there was no external lighting there. See Pl's CSOF ¶ 59 (citations omitted). The rapist approached the victim from behind and placed a hand on her forehead and a hand on her mouth and knocked her down; she did not see him before her head struck the ground. Id. ¶ 60 (citations omitted). Markel described the victim's head injuries as serious, and said that the lack of lighting was a potential impediment to her ability to identify the rapist. Id. ¶ 59 (citations omitted). The victim was crying throughout the attack and hysterical for some time afterwards. Id. ¶ 61. Her first description of the attacker was extremely limited and generic (a black male of medium height). Although they exchanged words, the victim did not notice anything unusual about the rapist's voice. Plaintiff, on the other hand, has submitted evidence that he has a distinctive, high-pitched voice.

The Court recognizes that "[a]n arresting officer advised of a crime by a person who claims to be the victim, and who has signed a complaint or information charging someone with the crime, has probable cause to effect an arrest absent circumstances that raise doubts as to the victim's veracity." Singer v. Fulton Cty. Sheriff, 63 F.3d 110, 119 (2d Cir. 1995) (citations omitted). Here, however, Markel testified as to having doubts about whether the victim was

able to accurately identify her assailant given the characteristics
of the crime scene, and the circumstances surrounding the attack.
In light of the strong evidence that the police themselves
fabricated what was later highlighted as the most crucial and
reliable piece of evidence against Plaintiff, there is at least an
issue of material fact as to whether the police had "a reasonable
basis for believing there [was] probable cause," Ricciuti, 124 F.3d
at 128, to proceed with the prosecution against Plaintiff.
Therefore, Plaintiff's malicious prosecution claim under Section
1983 may proceed.

### D.  Failure to Intercede to Prevent a Constitutional Violation

"A law enforcement officer has an affirmative duty to
intercede on the behalf of a citizen whose constitutional rights
are being violated in his presence by other officers." O'Neill v.
Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988) (citing, inter alia,
Gagnon v. Ball, 696 F.2d 17, 21 (2d Cir. 1982) (where police
officer not only declined to intercede on arrestee's behalf but
also assisted another police officer in detaining her, first
officer's participation in unlawful arrest sufficed to render him
liable to arrestee)).

Plaintiff asserts that Markel failed to intercede on his
behalf despite knowledge that Wernsdorfer was violating Plaintiff's
constitutional rights. Defendants argue that there is no evidence

that any of the other individual defendants knew about Wernsdorfer's misconduct or had the opportunity to intervene to prevent it. The Court agrees with Plaintiff that there are genuine issues of material fact as to whether Markel was aware of Wernsdorfer's fabrication of evidence and had the opportunity to intercede to prevent the unjust conviction that ultimately occurred.

Markel, by his own account, was present for much of the interrogation. For instance, Markel does not deny that it was he who promised Plaintiff that, if he confessed, he would go to a psychiatric hospital rather than jail. See Pl's CSOF ¶ 9 (citations omitted). Markel admitted at his deposition that he never heard Plaintiff make any admissions during the interrogation indicating that he had had any involvement in the crime. He also admitted that Plaintiff consistently and adamantly denied raping the victim. See Pl's CSOF ¶ 10 (citing Pl's Ex. D, Markel Dep., pp. 70-73, 78-79, 84, 131). Indeed, Markel conceded that Wernsdorfer must have fabricated Plaintiff's confession. See id. ¶ 14 (citing Pl's Ex. D, Markel Dep., pp. 107-08).

However, Markel maintained that up until his deposition, he did not know that Wernsdorfer had reported that Plaintiff confessed. For instance, Markel claimed that he left the interrogation room and did not observe Wernsdorfer's questioning through the one-way mirror, that he did not return to the room,

that he never asked Wernsdorfer what had transpired during the remainder of the interrogation or otherwise learned of what had happened, and that he never spoke to Wernsdorfer again about the case. See Pl's CSOF ¶¶ 42, 45-51 (citing, inter alia, Pl's Ex. D, Markel Dep., p. 106). Plaintiff counters with evidence that could convince a reasonable jury to reject as unbelievable Markel's claimed ignorance. Wernsdorfer testified that Markel was present during the entire interrogation, and he listed Markel's name on the oral synopsis,[7] indicating that Markel was present when Plaintiff made the alleged confession. See Pl's CSOF ¶¶ 36-43 (citations omitted). Pursuant to the RPD policy emphasizing the importance of having a witness (other than the questioner) to an interrogation, Markel should have been present throughout the process. See id. ¶ 39 (citation omitted). Markel admitted at his deposition that Plaintiff's interrogation was an important event in a serious criminal case. When asked to explain why he would have left the interrogation room in the middle of such a significant part of the investigation, Markel gave inconsistent and shifting explanations.[8]

---

[7]

    The document states, "Taken by: Det. J.J. Wernsdorfer & Off. W. Markel-Genesee Section." Pl's CSOF ¶ 37 (citing Pl's Ex. P, Oral Synopsis; other citations omitted).

[8]

    Markel first stated he had left the room in order to assemble a photo array; upon being confronted with evidence that the photo array had been shown to the victim before the interrogation, he admitted his error. Markel next explained he had either gone back on patrol or typed up his report. Upon being pressed on the implausibility of doing either of these activities in the midst of interrogating a suspect, Markel's attorney requested a recess. After conferring with his attorney, Markel reverted to his original answer about the photo array, despite the fact he had already testified that answer was incorrect.

In addition, Markel was a trial witness. The prosecutor, who testified that it was his practice to speak to all trial witnesses beforehand, said that it "just doesn't make sense" to him that Markel would have had no idea, until his deposition, that Plaintiff allegedly had confessed to the crime. See Pl's CSOF ¶ 44 (quotation and citations omitted). Markel admitted that he had an obligation to write up a report setting forth Plaintiff's consistent denials of guilt, and to forward it to the prosecutor. Although Markel states he may have done so, the prosecutor denied receiving a report from Markel, and there is no such report in the case-file. See Pl's CSOF ¶¶ 94-97 (citations omitted). Markel also conceded that if he had knowledge of Wernsdorfer's claim to have obtained a confession from Plaintiff, he had an obligation to inform the prosecutor that he (Markel) had not heard any such confession; not to do so was serious misconduct. See id. ¶ 94 (citation omitted).

In sum, there are multiple materials issues of disputed fact regarding what Markel knew about Plaintiff's alleged confession, and when he knew it. Viewing the facts and inferences to be drawn from them in the light most favorable to Plaintiff, a reasonable juror could find that Markel had contemporaneous knowledge that Wernsdorfer had falsified the confession, and had sufficient opportunity to intervene to prevent a wrongful conviction based on this fabricated evidence. See Deskovic v. City of Peekskill, 894 F.

---

See Pl's CSOF ¶¶ 46-50 (citations omitted).

Supp.2d 443, 462, 464 (S.D.N.Y. 2012) ("Deskovic alleges that Stephens is liable for failing to intercede to prevent the use of Deskovic's coerced confession. In particular, Deskovic claims that Stephens was aware of McIntyre's coercive tactics, and should have informed Bolen of the coercive circumstances of the interrogation. Stephens claims that he did not hear the confession or McIntyre's threats, and so he had no opportunity to intervene. . . . As there are material issues of disputed fact as to whether Stephens heard what McIntyre said to Deskovic while Stephens was in the second room, . . . summary judgment as to the failure to intercede claim is inappropriate.") (citing <u>Mejia v. City of N.Y.</u>, 119 F. Supp.2d 232, 280 (E.D.N.Y. 2000)). Plaintiff's Section 1983 claim based on the failure to intercede may go forward.

### E.    Conspiracy under Section 1983

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." <u>Pangburn v. Culbertson</u>, 200 F.3d 65, 72 (2d Cir. 1999) (citing <u>Carson v. Lewis</u>, 35 F. Supp.2d 250, 271 (E.D.N.Y. 1999) (citations omitted); <u>Ricciuti</u>, 124 F.3d at 131 (citing <u>Hinkle v. City of Clarksburg</u>, 81 F.3d 416, 421 (4th Cir. 1996)).

Plaintiff argues that Wernsdorfer and Markel engaged in conspiracy to violate his constitutional rights by fabricating his alleged confession, proffering it to the prosecutor as authentic, and testifying untruthfully that Plaintiff confessed. In addition to arguing that there was no underlying constitutional violation, Defendants contend that Plaintiff has adduced insufficient evidence of an agreement among the alleged co-conspirators and that the intracorporate conspiracy doctrine bars Plaintiff's claim.

As Plaintiff points out, the existence of a conspiracy, as well as a defendant's intent and participation in the conspiracy, may be established by circumstantial evidence. See, e.g., Rounseville v. Zahl, 13 F.3d 625, 632 (2d Cir. 1994) ("[C]onspiracies are by their very nature secretive operations that can hardly ever be proven by direct evidence[.]") (citations omitted). A plaintiff need not have proof of an explicit agreement; rather, "[a] 'conspiratorial agreement itself may be established by proof of a tacit understanding among the participants. . . ." United States v. Henry, 325 F.3d 93, 105 (2d Cir. 2003) (quotation omitted). As discussed above, there are disputed issues of material fact regarding whether Markel knew Wernsdorfer had fabricated Plaintiff's confession and implicitly condoned the misconduct by not alerting the prosecutor or anyone else to Wernsdorfer's deception. It is well settled that a conspiratorial agreement can simply be a "tacit understanding," United States v. Sabhnani, 599

F.3d 215, 244 (2d Cir. 2020), and a person "can be a conspirator by agreeing to facilitate only some of the acts leading up to the substantive offense." Salinas v. United States, 522 U.S. 52, 65 (1997).

Defendants also urge dismissal of this claim pursuant to the intracorporate conspiracy doctrine, and they cite Hermann v. Moore, 576 F.2d 453 (2d Cir. 1978), a case in which the plaintiff had asserted claims under both Section 1983 and 42 U.S.C. § 1985(2) ("Section 1985(2)"). The Second Circuit affirmed the district court's grant of summary judgment to the defendants on the Section 1985(2) conspiracy claim because "[e]very one of the defendants who was involved in the so-called conspiracy was either a trustee or faculty member of the Brooklyn Law School which is admittedly an educational corporation and was acting in that capacity in connection with the discharge[.]" 576 F.2d at 459. By contrast, in Section 1983 cases where the only allegedly conspiring defendants were agents or employees of the same State entity, the Second Circuit has not employed the intracorporate conspiracy doctrine and has allowed such claims to proceed past summary judgment. See, e.g., Ricciuti, 124 F.3d at 131 (material issues of fact precluded summary judgment for transit officers on malicious prosecution claim; a jury could find that one transit officer knowingly took part with the other officer in the distribution of a confession he knew to be false, and that both officers lied about the

circumstances surrounding the arrest; "[a] jury which so found might rationally infer that [the transit officers] were jointly involved in a common scheme—a conspiracy to ensure that plaintiffs were detained on false charges") (citation omitted). The Court is not persuaded that the intracorporate conspiracy claim applies in the Section 1983 context, and it declines to dismiss Plaintiff's conspiracy claim as a matter of law on that basis. The Section 1983 conspiracy claim may proceed.

## CONCLUSION

For the reasons discussed above, Defendants' Motion to Amend is denied with prejudice. Based on Plaintiff's stipulation of voluntary dismissal as to Deborah Fowler, Roy Irving, and John Doe Police Officer, all of these individuals are terminated as defendants, and the Clerk of Court is directed to modify the caption accordingly.

Based on Plaintiff's stipulation to voluntarily dismiss certain claims, judgment in Defendants' favor is granted to the extent that the following claims are dismissed with prejudice: all of Plaintiff's claims under the Rehabilitation Act (all of Count I); the claims for violations of the right against self-incrimination as alleged in Count II; the claims for the failure to investigate as stated in Count IV; and the claims for malicious prosecution under New York State law (all of Count VI). Accordingly, Count I is dismissed in its entirety; Count II is

dismissed in part; Count III is dismissed in part; and Count VI is dismissed in its entirety.

Defendants' Motion for Summary Judgment (Dkt #91) is granted in part, to the extent that the <u>Brady</u> claim asserted in Count II concerning the Markel evidence is dismissed.

Defendants' Motion for Summary Judgment is denied with regard to Plaintiff's remaining claims. In particular, the following claims may proceed: the claim for the denial of a fair trial based on the fabricated confession asserted in Count II; the <u>Brady</u> claim based on the Fowler report asserted in Count II; the Section 1983 malicious prosecution claim asserted in Count III; the Section 1983 conspiracy claim asserted in Count IV; and the Section 1983 failure to intercede claim asserted in Count V. The only defendants remaining at this point in time are Markel, Wernsdorfer, the administratrix of Wernsdorfer's estate, and the City of Rochester.

**ORDERS**

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' Motion to Amend (Dkt #91) is denied with prejudice. It is further

**ORDERED** that Deborah Fowler, Roy Irving, and John Doe Police Officer, are terminated as defendants, and the Clerk of Court is directed to modify the caption accordingly. It is further

**ORDERED** that Count I is dismissed in its entirety; Count II is dismissed in part as to the claims for violations of the right

against self-incrimination; Count III is dismissed in part as to the claims for the failure to investigate; and Count VI is dismissed in its entirety. It is further

**ORDERED** Defendants' Motion for Summary Judgment (Dkt #91) is granted in part, to the extent that the <u>Brady</u> claim asserted in Count II concerning the Markel evidence is dismissed. It is further

**ORDERED** that Defendants' Motion for Summary Judgment (Dkt #91) is denied with regard to the following claims, which remain pending: the claim for the denial of a fair trial based on the fabricated confession asserted in Count II; the <u>Brady</u> claim based on the Fowler report asserted in Count II; the Section 1983 malicious prosecution claim asserted in Count III; the Section 1983 conspiracy claim asserted in Count IV; and the Section 1983 failure to intercede claim asserted in Count V.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     May 4, 2016
           Rochester, New York