UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

FREDDIE PEACOCK,

                              Plaintiff,      **No. 6:13-cv-6046-MAT**
                                              **DECISION AND ORDER**

          -vs-

CITY OF ROCHESTER; WAYNE MARKEL; JOHN
J. WERNSDORFER; and SANDRA J.
WERNSDORFER, SOLELY AS ADMINISTRATRIX
AND FIDUCIARY OF THE ESTATE OF JOHN
J. WERNSDORFER,

                              Defendants.

---

## INTRODUCTION

On May 4, 2016, the Court issued a Decision and Order (Dkt #113) denying in part Defendants' Motion for Summary Judgment and allowing a number of the civil rights claims asserted by Freddie Peacock ("Plaintiff" or "Mr. Peacock"), based on his wrongful conviction and incarceration, to proceed to trial. The parties subsequently entered into a Settlement Agreement (Dkt #114) filed on June 15, 2016. Pursuant to the Settlement Agreement, the parties stipulated to have this Court render a binding and unappealable written decision on the issues of the damages and attorney's fees to be awarded to Plaintiff by Defendants. The Court has received and reviewed Defendants' Brief and Evidence Submission in Regard to Damages, with attached exhibits A-L; Plaintiff Freddie Peacock's Brief as to Damages; Plaintiff Freddie Peacock's Exhibits as to Damages, with attached Exhibits A-T; Affidavit of Donald

Thompson, Esq. Relative to Plaintiff's Damages; CD titled "Video Presentation of Freddie Peacock Damages"; and Defendants' Brief Concerning Plaintiff's Costs and Attorneys' Fees, all of which have been filed under seal. The following constitutes this Court's decision on the issues reserved to it in the Settlement Agreement.

## CHRONOLOGY OF RELEVANT EVENTS

On July 22, 1976, Plaintiff worked two shifts at his job as head cook at the Ramada Inn, went home to his apartment at 47 Troup Street, and went to bed. On July 23, 1976, Plaintiff was arrested by officers of the Rochester Police Department and charged with raping a woman who was one of his neighbors at the apartment complex. On December 16, 1976, a jury convicted him of first-degree rape. He was sentenced to an indeterminate term of up to 20 years, and remanded to Clinton Correctional Facility.

Plaintiff, who has been suffering from a major mental illness since at least age 20, suffered a breakdown soon after his arrival in prison and was sent to Matteawan State Hospital. Once he had recovered sufficiently to return to general population, he was transferred to Attica Correctional Facility, where he served the remainder of his sentence. While there, Plaintiff suffered two more mental breakdowns, for which he was sent to Marcy State Hospital for treatment.

Plaintiff was released to parole on May 13, 1982. On March 19, 1992, the New York State Division of Parole discharged him from its custody.

Over the next two decades, Plaintiff attempted to clear his name. Eventually, with the assistance of the Innocence Project, Plaintiff was able to obtain DNA testing that excluded him as the perpetrator the rape for which he was convicted. Upon the joint request of the Monroe County District Attorney's Office and the Innocence Project, Plaintiff's conviction was vacated by the Monroe County Supreme Court (Egan, J.) on February 4, 2010. This civil action followed.

## DISCUSSION

### I.   Damages

#### A.   Overview of the Parties' Positions

Defendants maintain that $3 million, inclusive of attorney's fees, is the "appropriate settlement figure." Defs' Damages Br. at 3. However, Plaintiff's Attorneys counter and argue that "anything less than an eight-figure award" would not fairly compensate Mr. Peacock, and suggest a total damages award of $18,294,874. Specifically, Plaintiff's Attorneys propose $1.5 million per year of incarceration ($8,715,000 for 5 years, 9 months, and 21 days); $250,000 per year for the period from his release from prison in 1992 to his exoneration in 2010 ($6,937,500); $100,000 per year for

the period from his exoneration through his estimated life expectancy ($2,200,000); and $442,374 in lost wages.

**B. Legal Standards**

Title 42 U.S.C., Section 1983 "creates a species of tort liability in favor of persons who are deprived of rights . . . secured to them by the Constitution." Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 305-06 (1986) (quotation marks, quotations, and citations omitted). "[C]ompensatory damages [in Section 1983 cases] may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation and standing in the community, personal humiliation, and mental anguish and suffering.'" Id. (quoting Gertz v. Robert Welch, Inc., 418 U.S. 323, 350 (1974); ellipsis omitted; citation omitted). "[O]nce the existence of damage is shown with reasonable certainty, difficulty in calculating the amount with mathematical precision will not defeat recovery." Blackwell v. Sun Elec. Corp., 696 F.2d 1176, 1192 (6th Cir. 1983) (citing Perma Research and Dev. v. Singer Co., 542 F.2d 111, 116 (2d Cir.), cert. denied, 429 U.S. 987 (1976)). Since Defendants "produced the damage, [they] must bear the uncertainty of proof." Perma Research, 542 F.2d at 116 (citation omitted).

"Where triers of fact must assign values to the intangible and invaluable," it is appropriate to "look to the values assigned by other fact-finders in the past. . . for perspective and as an indication of how society has valued these harms." Limone v.

United States, 497 F. Supp.2d 143, 243 (D. Mass. 2007), aff'd on
other grounds, 579 F.3d 79 (1st Cir. 2009). With these principles
and categories of damages as guideposts, this Court, sitting as a
factfinder, must "arrive at a sum of money that will justly, fairly
and adequately compensate [Mr. Peacock] for the damages he
endured[,]" and must do so "without favor, without sympathy, and
without any precise formula[.]" Transcript in Deskovic v. City of
Peekskill, 07 Civ. 8150 KMK (S.D.N.Y. Oct. 23, 2014) ("Deskovic
Tr.") (Pl's Ex. A).

### C.   Assessment of the Various Categories of Damages

#### 1.   Loss of Liberty

"Damages attributable to loss of liberty include damages for
the loss of the fundamental right to be free, lost opportunities to
engage in everyday activities while confined, and for the mental
anguish that accompanies the loss of liberty[.]" Sanabria v. State
of N.Y., 29 Misc.3d 988, 994 (N.Y. Ct. Cl. 2010) (citation
omitted). "The mental anguish suffered by an inmate while he is in
prison encompasses his discomfort, fear, lack of privacy and
degradation[.]" Baba-Ali v. State of N.Y., 24 Misc.3d 576, 581–82
(N.Y. Ct. Cl. 2009), aff'd in part, rev'd in part, 907 N.Y.S.2d 432
(2d Dep't 2010), aff'd as modified, 19 N.Y.3d 627 (2012). As courts
have noted, the "mental distress of one unjustly imprisoned is
obviously different and greater than one justly in jail. . . ."

Carter v. State, 528 N.Y.S.2d 292, 297 (Ct. Cl. 1988), aff'd, 546 N.Y.S.2d 648 (2d Dep't 1989).

Various circumstances are relevant to the assessment of the mental anguish caused by imprisonment, including "the stigma attached to the type of conviction, whether the individual previously was incarcerated, the presence or absence of a significant criminal history prior to the unjust conviction and the basis for the prior conviction (a claimant who may not have been guilty of the crime charged but knew he was guilty of something else will suffer less than one who knows he is truly innocent of any wrongdoing)[.]" Baba-Ali, 24 Misc.3d at 580 (citations omitted).

Here, as noted above, Plaintiff was falsely convicted of first-degree rape. In both civil society and prison society, sex offenses are viewed as the most ignominious of crimes.[1] Indeed, Plaintiff was so shocked by the allegations against him because he believed that rape was "the worst charge anyone could ever have . . . worse than murder." Plaintiff has submitted evidence indicating that the nature of his conviction further exacerbated his mental

---

[1]   See, e.g. Komlosi v. Fudenberg, No. 88 CIV. 1792 HBP, 2000 WL 351414, at *15 (S.D.N.Y. Mar. 31, 2000) ("The special opprobrium society has for sex offenders is evidenced by New York Corrections Law § 168-c et seq. which requires the registration of sex offenders and public notice of their presence in a community. No similar requirements are applicable to convicted murderers, contract assassins, bombers, robbers, arsonists, burglars, violent muggers or narcotics traffickers who sell drugs to minors."); Neal v. Shimoda, 131 F.3d 818, 829 (9th Cir. 1997) ("We can hardly conceive of a state's action bearing more 'stigmatizing consequences' than the labeling of a prison inmate as a sex offender.") (footnote omitted).

anguish while incarcerated and worsened the conditions of his confinement. For instance, Plaintiff recounts that he was regularly called "Chester Molester" by other inmates, and was subjected to sexual harassment by them. In addition, he was the victim of several assaults. On one occasion, Plaintiff states, two inmates "jumped him" in the bathroom; the correction officers who intervened to stop the attack told Plaintiff, "'[E]verybody on the floor hates you because you got a rape charge.'" Report of Dr. Charles Ewing ("Ewing Rep."), p. 5 (Pl's Ex. K).[2] On another occasion, he relates, two inmates repeatedly approached him over the course of a week and rubbed various parts of his body in a sexually suggestive manner, and he "froze" because he was powerless to stop it. Eventually, Plaintiff says, he was transferred to another block for his safety. When a female civilian employee was murdered at Attica, he became frightened and paranoid that he would be accused of the crime, since he already had been convicted once based upon false allegations.

Although Plaintiff had two criminal arrests prior to his unjust conviction (one for intoxication and one for arson, which was the product of his psychiatric decompensation, and which was later dismissed), it is undisputed that he did not have a significant criminal history, and he certainly did not spend any

---

[2]

Plaintiff reports that at least two of the assaults he sustained while incarcerated occurred at Marcy State Hospital, where he had been sent for treatment of his worsening psychiatric symptoms.

time incarcerated. It is also important that no part of Plaintiff's sentence for the unjust conviction was for a lawful conviction and thus, he lacked any "lawful" time during which he might have acclimated to prison life. See Newton, 2016 WL 1071105, at *15 n. 15 (citing Green v. Baca, 226 F.R.D. 624, 657 (C.D. Cal. 2005) (collecting cases "suggest[ing] that a person who has previously been incarcerated may suffer less damage as a result of a subsequent wrongful incarceration")). The Court has also taken into account the voluminous evidence submitted regarding Plaintiff's gentle and peaceful nature, and the relative fragility of his emotional health, in concluding that the mental distress he suffered during prison was especially grievous. For instance, one of his high school friends described Plaintiff as being "like the lamb among the wolves" in prison. Another stated, "I don't know how he survived [prison], he's too nice." And Plaintiff's psychiatric expert, Dr. Ewing, stated that Plaintiff's mental illness makes it difficult for him to deal with and speak about emotionally-charged issues, so he may be underreporting the gravity of his experiences while incarcerated. See Ewing Rep. at 2, 5 (Pl's Ex. K).

The Court recognizes that no amount of money can compensate Plaintiff for the emotional distress he experienced while unjustly imprisoned, and that his anguish was aggravated by his knowledge of his innocence and the symptoms of his severe and chronic mental illness. After surveying the authorities cited by the parties, and

conducting its own research, the Court finds that $5 million is a fair and appropriate award for Plaintiff's loss of liberty and the pain and suffering caused by his imprisonment.

### 2.   Loss of a Normal Life

Plaintiff alleges non-pecuniary losses for the time period from his release from prison to his exoneration ($250,000 per year, for 27 years and 9 months; or $6,937,500), and from his exoneration at age 54 to the end of his estimated life expectancy ($100,000 per year, for 22 years; or $2,200,000). As an initial matter, the Court notes that such "per unit damage assessments have not generally been accepted in [New York.]" Carter, 528 N.Y.S.2d at 297 (citing 1 PJI2d 2:280, p. 629; Tate v. Colabello, 58 N.Y.2d 84 (1983)); see also Baba-Ali, 24 Misc.3d at 595 n. 8. The Court accordingly has not analyzed this category of loss in those terms.

Plaintiff's Attorneys' have presented an extremely detailed "before and after" picture of Mr. Peacock's life, one which has not been challenged in any meaningful way by Defendants. The Court observes that Defendants' psychiatric expert, Dr. Mark A. Martinez, did not conduct a personal interview of Plaintiff or any of his family members or friends. Notably, Dr. Martinez "agree[d] with Dr. Ewing[, Plaintiff's psychiatric expert,] in that Mr. Peacock's wrongful arrest, conviction, and incarceration has negatively affected his ability to trust women and has likely changed his social functioning and personality. These changes appear to have

-9-

endured over several years and are likely to continue regardless of the treatment provided." Martinez Rep., p. 14 (Defs' Ex. B).

Dr. Ewing commented that the Freddie Peacock "who existed in his twenties died when he went to prison. That person is no longer with us." This assessment is borne out by Plaintiff's evidentiary submissions, which include the statements of ten of his family members and close friends, many of whom have known him since he was a child. Friends and family who observed Plaintiff after his release from prison describe a nervous and withdrawn person who avoided eye contact, who "would cower down, like he was used to being shunned"; they uniformly say that "nothing about him" resembled the person they once knew.

A psychological assessment prepared in 1988, six years after Plaintiff's release, stated that "his thought content [was] primarily limited to his agenda to overturn his rape conviction and his plans to become a chef. . . . He also makes frequent reference to 'women judging [him]' or 'acting afraid around [him]' because of the rape charge." However, Plaintiff's exoneration did not bring the peace or fulfillment he had expected; he described it as "just another day." He states that the "rape charge killed" his wish to get married and have a family; he still fears becoming involved with a woman because he worries he could be falsely accused of rape again. Plaintiff's sister explains that he is no longer as close with her daughter (his niece), with whom he spent so much time

before his incarceration. Indeed, he is afraid to be alone with any woman at all, to the point of even refusing to have a female doctor. Dr. Ewing notes that Plaintiff and his friends describe him as now leading a "rather isolated and limited lifestyle with little engagement with others" and being plagued by anxiety, self-consciousness, and low self-esteem. His friends describe Plaintiff now as "more of a loner," who "stays away from everything," whereas prior to his unjust conviction, he served as a deacon, devotional leader, and Sunday school teacher in his church; and was part of a large circle of friends in high school. His experience of being unjustly convicted also caused him to abandon his passionate interest in cooking, and his pursuit of a career in the restaurant business. Although Plaintiff tried to work in restaurants after his release, he found himself unable to continue because, in his words, "you deal with a lot of women, especially waitresses. You might get in a conflict with waitresses. As a guy with a rape charge, I didn't think I could deal with that situation."

While the Court is cognizant that no amount of money can resuscitate Plaintiff's quashed dreams of getting married, having a family, and earning a livelihood doing something he enjoyed, the Court will award $750,000 as future non-pecuniary damages.

### 3.   Lost Wages

Plaintiff's Attorneys retained economist William C. Blanchfield, Ph.D. to evaluate the economic losses sustained by

Mr. Peacock, who has a high school education and has not worked since his arrest in 1976. The economist assumed a wage base of $8,241, which is what Mr. Peacock earned in 1975 while he was working as a cook, and applied a two-percent yearly increase based on U.S. Department of Labor statistics. Dr. Blanchfield assumed a work-life expectancy of 64 years, and subtracted ten percent of Mr. Peacock's remaining work-life for periods of unemployment, and included mandated employer contributions such as Social Security. In total, the economist found that Mr. Peacock's total losses are $442,374.

Defendants have not raised specific challenges to Dr. Blanchfield's opinion but suggest that Mr. Peacock has no identifiable pecuniary losses. According to Defendants, since Mr. Peacock "was unable to hold a steady job" prior to his unjust conviction, it is "pure speculation" that he would have been able to hold a job with any more success had he not been incarcerated. Defendants note that Plaintiff's employment history was uneven, due in large part to exacerbations of his mental illness. See Def's Damages Br. at 28-29 (chronicling employment history commencing in high school). Although Plaintiff's mental illness, which emerged in 1970, led to various hospital commitments, the fact remains that Plaintiff continued to obtain jobs and maintain employment during the period of time from his diagnosis to his arrest. For instance, in 1974, Mr. Peacock earned $7,835, before he was admitted to

Rochester Psychiatric Center ("RPC") in November. In August of 1974, it was noted that he had adjusted well to his new apartment and was in "good remission." In 1975, the year upon which Dr. Blanchfield relied for his wage base, treatment notes from March and August indicate that when Mr. Peacock came in to the RPC to renew his prescriptions, he was still employed as a cook at the Flagship Restaurant and was residing on Troup Street. In 1976, Mr. Peacock earned $3,929 in the months prior to his July arrest, notwithstanding admissions to Rochester State Hospital in January and the RPC in March.

The Court finds that Dr. Blanchfield's opinion generally is well-supported and reasonable. Given that it has been unrebutted in any particular aspect by Defendants, the Court will award $442,374 in lost wages.

### D.   Offset for Court of Claims Award

Defendants argue that any award for damages in this action should be offset by the $1.5 million award obtained by Mr. Peacock in the New York State Court of Claims under New York Court of Claims Act § 8-b ("Section 8-b"), also known as the Unjust Conviction and Imprisonment Act of 1984.[3] Courts in New York have

---

[3]

Section 8-b requires a claimant to establish by documentary evidence, inter alia, that his conviction was reversed or vacated and the accusatory instrument dismissed on one of several enumerated grounds; that he is likely to succeed at trial in proving by preponderating evidence that he did not commit any of the acts charged; and that he did not, through his own conduct, contribute to his conviction. Fudger v. State, 520 N.Y.S.2d 950, 952 (3d Dep't 1987) (quotation omitted).

interpreted Section 8-b consistent with traditional tort principles. E.g., Carter v. State, 528 N.Y.S.2d at 295. The types of damages, and the time periods for which they are available, are essentially identical under both 42 U.S.C. § 1983 and Section 8-b. See id.

Defendants assert that Plaintiff cannot be allowed to recover a double payment, and therefore any damages awarded by this Court must be reduced by the $1.5 million that he received in the Section 8-b proceeding. Defendants' cite Carter v. State, supra, where the Court of Claims considered whether an exonerated person, who had received a settlement from county officials under Section 1983 based on his wrongful conviction, could recover from the State under Section 8-b. The Court of Claims observed that "whether deemed a reduction of claim under the General Obligations Law [§ 15-108,[4] which embodies a pro tanto allocation or set-off rule among joint tortfeasors], or an equitable avoidance of double recovery, . . . the subject federal settlement must be considered in . . . [the] determination of the sum of money, if any, that claimant may recover under [Section 8-b]." Carter, 528 N.Y.S.2d at 295. Analyzing the components of damages awarded in the

---

[4]

   It is unclear why General Obligations Law § 15-108 was mentioned by the Court of Claims, since that statute applies to joint tortfeasors. Section 8-b, however, is essentially a no-fault statute, in that it allows recovery of damages from the State regardless of liability. See Baba-Ali, 24 Misc.3d at 591 (Section 8-b was a statute born out of a moral obligation "not designed to compensate a claimant for a tort actually committed by the State").

Section 1983 case and alleged in the Section 8-b claim, the Court of Claims found that "[w]hatever differences there may be in the theories or bases of liability of [Section 8-b and Section 1983], on this record we believe it proper to find that the bulk of the damages sought in the federal action were ones sustained as a result of claimant's unjust conviction and imprisonment." Carter, 528 N.Y.S.2d at 298. It found that while the claimant had shown liability, he failed to show that he had not already been fully compensated for those damages, and that "unrecompensed damages are an essential element of a claim" under Section 8-b "inasmuch as it would be pointless to enter a judgment for no damages." Id. at 299. Accordingly, the court dismissed the Section 8-b claim. Thus, Carter did not explicitly decide whether a rule of set-off was applicable; rather, its holding went to the question of whether the claimant had stated a prima facie case for relief under Section 8-b.

Plaintiff has cited a decision from the Eastern District of New York applying federal law to the question of whether a defendant is entitled to set-off of a Section 8-b award against a Section 1983 award, and reaching the contrary result. See Pl's Br. at 15-16 (citing Order (CM/ECF No. 225) in Restivo, et al. v. Nassau County, et al., 06-CV-6720(JS)(SIL) (E.D.N.Y. Nov. 12, 2014) ("Restivo Order")). While the district court found that the county defendants were not automatically precluded from arguing set-off,

see <u>Restivo</u> Order at 13-17, the court ultimately found that the Section 8-b settlements could not present a set-off in the Section 1983 claims. Since Section 8-b imposes liability on the State regardless of whether the State is liable in the sense of a "traditional" tortfeasor, those settlements were not relevant to the Section 1983 claims, which had been brought against county actors. That is, the State's proportionate share of liability[5] in regards to the Section 1983 claims was zero. <u>Id.</u> at 28-29. Accordingly, the district court denied the defendants' motion for a set-off. <u>Id.</u>, pp. 29-30. The district court in <u>Restivo</u> also found that the jury's award did not violate the rule against double recovery notwithstanding previous Section 8-b settlements received by the plaintiffs, finding that the rule against double recovery only applies only to judgments. <u>Id.</u> at 12-13.[6] The Court elects to follow the reasoning of the district court in the <u>Restivo</u> Order, and the cases cited therein, which applied federal law.

---

[5]

    The district court in <u>Restivo</u> also found that General Obligations Law ("GOL") § 15-108 conflicted with federal law, since federal courts have rejected a <u>pro tanto</u> allocation rule in Section 1983 cases, opting instead to analyze the settling party's proportionate share of liability. <u>Restivo</u> Order at 28 (citations omitted). In any event, GOL § 15-108 applied only where the settling party and non-settling party are joint tortfeasors. <u>Id.</u> at 29 (citations omitted). In <u>Restivo</u>, as here, there was no overlap between the Section 8-b case and Section 1983 case, either under the law or on the particular facts. <u>Id.</u> at 29-30.

[6]

    An additional reason for finding that double recovery does not apply is that the State, the defendant in the Section 8-b, was not a joint tortfeasor with the Section 1983 defendants. <u>See</u> <u>Barkley v. United Homes</u>, LLC, 848 F. Supp. 2d 248, 265 (E.D.N.Y. 2012) ("Because the Rule 19 defendants are not tortfeasors with the trial defendants, any settlement would not result in a double recovery."), <u>aff'd</u>, 557 F. App'x 22 (2d Cir. 2014).

Accordingly, the Court rejects Defendants' set-off/double recovery argument as inapplicable under the factual circumstances of this case.

## II.  Attorney's Fees

### A.    Overview of the Parties' Positions

Defendants, in the Settlement Agreement, did not require a formal fee application from Plaintiff's Attorneys consisting of contemporaneously kept time records. Plaintiff's Attorneys therefore have submitted their estimated hours and a rationale for their legal services. Plaintiff's Attorneys indicate that they have expended approximately $75,000 in litigation expenses,[7] and have spent approximately 2000 hours over the past two-and-a-half years of this litigation. Plaintiff's Attorneys request "approximately $1.4 million" in legal fees. See Pl's Br. at 40. Defendants do not contest Mr. Peacock's entitlement to legal fees and costs, but contend that the amounts requested by Plaintiff's Attorneys are unreasonable, excessive, and contrary to law.

### B.    Determination of the Appropriate Hourly Rate

This Court's task in determining the appropriate award of attorney's fees under 42 U.S.C. § 1988 is to set a fee "adequate to attract competent counsel," but "not produce windfalls to attorneys." Blum v. Stenson, 465 U.S. 886, 893-94 (1984) (quotation

---

[7]

These include expert witness fees, depositions, travel to and from Rochester (for the New York City attorneys) and "preparing submissions for mediation and this damages presentation." Pl's Br. at 40.

omitted). Where, as here, the Court is "faced with a request for an award of higher out-of-district rates," it "must first apply a presumption in favor of application of the forum rule." Simmons v. New York City Transit Auth., 575 F.3d 170, 175 (2d Cir. 2009). Overcoming that presumption requires a litigant to "persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." Id. In other words, "[t]he party seeking the award must make a *particularized showing*, not only that [1] the selection of out-of-district counsel was predicated on *experience-based, objective* factors, [e.g., counsel's special expertise in litigating the particular type of case] but also [2] of the likelihood that use of in-district counsel would produce a *substantially inferior* result." Id. at 176 (emphases supplied).

Defendants argue Plaintiff cannot demonstrate a "likelihood that use of in-district counsel would produce a substantially inferior result[,]" Simmons, 575 F.3d at 176. The most obvious reason they cite is that Plaintiff has had the very capable assistance of in-district counsel, Don Thompson, Esq. of Easton Thompson Kasperek Shiffrin LLP ("ETKS"), throughout this litigation. ETKS, a highly experienced, well-regarded law firm focusing on criminal defense-related work, has handled and successfully settled other wrongful conviction cases. For instance,

Attorney Thompson,[8] in 2010, settled the wrongful conviction lawsuit brought by Frank Sterling.     Plaintiff's Attorneys counter by citing <u>Restivo v. Nassau County</u>, No. 06-CV-6720(JS)(SIL), 2015 WL 7734100 (E.D.N.Y. Nov. 30, 2015), as an example of a wrongful conviction case in which the district court authorized out-of-district attorney's fee rates to NSB, who is jointly representing Mr. Peacock with ETKS in this matter. <u>See Restivo</u>, 2015 WL 7734100, at *3. However, a review of <u>Restivo</u>'s eight-year procedural history shows that it is readily distinguishable from the instant case. Notably, while DNA testing was instrumental in securing the vacatur of Mr. Peacock's conviction, the parties to this lawsuit stipulated to those DNA test results. Thus, the forensic science was not at issue here; in <u>Restivo</u>, the plaintiffs offered nine expert witnesses and the defendants offered four, and challenges to eight of the plaintiffs' experts led to a five-day <u>Daubert</u> hearing. In contrast to the protracted discovery in <u>Restivo</u>, which involved 35 depositions,

---

[8]

    <u>See</u>, <u>e.g.</u>, <u>http://www.itcouldhappen2you.org/about-us/</u> ("For over twenty years, Don [Thompson] has maintained a private practice. He has represented death-row inmates before the United States Supreme Court. Don has worked to obtain the release and exoneration of wrongfully convicted defendants, among them: Douglas Warney, who was released after serving 10 years of a 25-to-life sentence when renewed DNA testing helped establish that he was innocent; Frank Sterling, who was released after serving nearly 19 years of a 25-to-life sentence when renewed DNA testing proved he was innocent, and Freddie Peacock, who was exonerated 21 years after his wrongful conviction when DNA testing showed that he was innocent of the crime for which he was convicted. Don was awarded the New York State Defenders Association 2010 Service of Justice Award for his work in exonerating Frank Sterling.") (last accessed July 27, 2016); <u>see also</u> http://nydailyrecord.com/2010/04/28/sterling-freed-after-18-years/ (last accessed July 27, 2016).

only five witnesses were deposed here. Notably, this case settled prior to trial, while in <u>Restivo</u>, there were two lengthy trials involving about 40 witnesses each. Moreover, throughout most of discovery and the first trial in <u>Restivo</u>, the plaintiffs' case was joined with that of a third man claiming wrongful conviction, which substantially complicated the legal and factual issues in the case. The factors identified by the district court in <u>Restivo</u> as warranting out-of-district rates are absent, and this case does not assist Plaintiff's Attorneys in making the particularized showing required to overcome the forum presumption rule.

Attorney Thompson, local counsel, has not identified his usual hourly rate, but asserts that he has billed as high as $600 per hour, which is only $50 less than the out-of-district rate requested. Based on the Court's survey of the caselaw, and given their particular expertise in these matters, it finds that $425 per hour is an appropriate rate for the highly experienced attorneys (Attorney Thompson from ETKS and Attorney Brustin from NSB) who litigated this case, and who indicated that they spent about 600 hours each on it.  "The calculation of a presumptively reasonable attorney's fee is generally governed by the lodestar approach, which requires the Court to multiply 'the number of hours reasonably expended' by a 'reasonable hourly rate.'" <u>Abascal v. Fleckenstein</u>, No. 06-CV-0349SSR, 2014 WL 7075580, at *2 (W.D.N.Y. Dec. 15, 2014) (quoting <u>Hensley</u>, 461 U.S. at 433; citation

omitted). This yields an award of $540,000 in attorney's fees
(1,200 hours x $450/hour) with regard to Attorney Thompson and Nick
Brustin, Esq. of Neufeld Scheck & Brustin LLP ("NSB"). Plaintiff's
Attorneys indicate that "at least six other attorneys from [NSB],
including three partners and three associates, have spent
substantial amounts of time" on this case. Pl's Br. at 41. The
Court presumes that these attorneys' time makes up the remaining
800 hours of the 2,000 spent on this case by Plaintiff's Attorneys.
The Court also has presumed to divide these 800 hours equally
between the partners and the associates, since the Court was not
presented with a detailed breakdown. Plaintiff's Attorneys have not
identified these other lawyers' hourly rates, so the Court has
presumed the following rates, which it finds are in line with rates
awarded to attorneys of such experience in this District: $225 for
partners, and $175 for associates. Applying the lodestar approach
yields an award of $90,000 for the partners ($225 per hour x 400
hours) and $70,000 for the associates ($175 per hour x 400 hours).
The total attorney's fee award therefore is $700,000, to be shared
equally by Plaintiff's Attorneys, plus $70,000 in costs, to be
apportioned by Plaintiff's Attorneys according to their respective
contributions.

C.    **Time Spent on Court of Claims Action Is Not Compensable**

Plaintiff's attorneys have also requested fees and costs
accrued in the prosecution of Mr. Peacock's successful claim

against the State of New York under Section 8-b, but have not identified how many hours were spent on that matter. "[T]he party seeking an award of fees has the burden of submitting 'evidence supporting the hours worked and rates claimed.'" Webb v. Bd. of Educ. of Dyer County, Tenn., 471 U.S. 234, 242 (1985) (quotation omitted). "The time that is compensable under § 1988 is that 'reasonably expended *on the litigation*.'" Id. (quoting Hensley v. Eckerhart, 461 U.S. 424, 433 (1983); emphasis in Webb). Title 42 U.S.C., § 1988 provides that "[i]n any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title. . . the court . . . may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).  In N. Carolina Dep't of Transp. v. Crest St. Cmty. Council, Inc., 479 U.S. 6 (1986), the Supreme Court considered the question of "whether attorney's fees may be awarded in an independent action which is *not* to enforce any of the civil rights laws listed in § 1988." Id. at 12 (emphasis added). The Supreme Court held that "[u]nder the plain language and legislative history of § 1988," "*only* a court in an action to enforce one of the civil rights  laws listed in § 1988 may award attorney's fees." Id. at 15 (emphasis added).

Plaintiff's Attorneys assert without elaboration that "because of the overlap between the issues in dispute, work performed by [them] . . . on Mr. Peacock's claim under [Section 8-b] . . . is

compensable here." Pl's Br. at 41. However, as <u>Webb</u> illustrates, the fact that a state lawsuit arises from similar facts as a Section 1983 action is insufficient, standing alone, to warrant including fees and costs charged in connection with the state lawsuit. Although the Supreme Court noted in <u>Crest Street</u> that "even if the prior proceeding is not a 'proceeding to enforce' one of the § 1988 civil rights laws, the 'discrete portion of the work product from the administrative proceedings' that 'was both useful and of a type ordinarily necessary to advance the civil rights litigation to the stage it reached before settlement' can be part of the attorney's fees awarded under § 1988[,]" <u>id.</u> (quoting <u>Webb</u>, 471 U.S. at 243), Plaintiff's Attorneys here have failed to delineate any "discrete portion" from the Section 8-b proceeding that was useful and necessary to the instant Section 1983 lawsuit. Accordingly, assuming that Plaintiff's Attorneys had submitted an estimate of the hours spent on the Section 8-b matter, the Court finds that the attorney's fees and costs expended in connection therewith are not compensable under Section 1988 in this proceeding.

### D. Unsuccessful Claims Have No Effect on Fee Award

Defendants argue that the fees awarded to Plaintiff's Attorneys should be reduced proportionally based on the fact that a number of defendants and causes of action were dismissed prior to settlement. Specifically, the complaint named seven defendants and

set forth six causes of action. During discovery, Plaintiff
stipulated to the dismissal of all claims against Deborah Fowler.
After the filing of Defendants' summary judgment motion, Plaintiff
stipulated to the dismissal of Roy Irving and the "John Doe" police
officer. In addition, the Court dismissed the first and sixth
causes of action, and portions of the second cause of action, in
its summary judgment decision.

"[F]ull fees may be awarded to a partially prevailing
plaintiff when the underlying claims when the underlying claims are
intertwined. . . ." <u>Green v. Torres</u>, 361 F.3d 96, 99 (2d Cir. 2004)
(citing <u>Hensley</u>, 461 U.S. at 435-37). In such circumstances, "the
court retains substantial discretion to take into account the
specific procedural history and facts of each case." <u>Id.</u> (Citation
omitted). The Supreme Court has "recognize[d] that claims can be
intertwined based on common facts as well as common legal
theories." <u>Green</u>, 361 F.3d at 98 n.2 (citing <u>Hensley</u>, 461 U.S. at
435; other citation omitted).

Here, the dismissed claims were factually intertwined with the
surviving claims since they all arose out of a common chronology of
events: his arrest, the procurement of the falsified confession,
his prosecution, and his conviction. <u>See</u>, <u>e.g.</u>, <u>Webb v. Sloan</u>, 330
F.3d 1158, 1169 (9th Cir. 2003) (even without commonality of law,
plaintiff's claims were related for the purpose of awarding fees
where all of the plaintiff's "claims arose out of a common core of

facts and a common course of conduct: [p]laintiff's arrest, detention, and prosecution"). Moreover, Plaintiff had a reasonable, good faith basis for including the defendants who ultimately were dismissed. As a lieutenant, Irving was in a supervisory role over Markel and Wernsdorfer, who both remain as defendants. Furthermore, Irving and Fowler figured in the narrative of events leading up to the falsified confession. Fowler, in particular, interviewed the victim at Markel's request and allegedly obtained an identification of Plaintiff.

This case was litigated by competent, experienced counsel, in a well-thought-out manner. Accordingly, the Court declines to reduce the fee award because Plaintiff "failed to prevail on every contention raised in the lawsuit." Hensley, 461 U.S. at 435-36 ("Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. . . .") (footnote and internal citation omitted).

**E. Plaintiff's Motion Practice During Discovery Has No Effect on Fee Award**

Defendants assert that Plaintiff's Attorneys' fee award should be reduced based on what Defendants characterize as "unnecessary and redundant" discovery motion practice, namely, five motions to compel and for sanctions. While sanctions were not ordered, the Court finds that the motions had a legitimate factual basis. Magistrate Judge Feldman, after a hearing, instructed the parties

to submit a proposed stipulated scheduling order regarding the disclosures requested by Plaintiff. This Court therefore cannot say that these motions were "unncessary."

Defendants also state that Plaintiff purportedly "caused" them to file a Motion to Seal portions of the deposition transcript of a City's witness, and complain that Plaintiff later made a motion to remove the confidentiality designation on the same deposition. Reviewing the docket, it appears that Defendants filed a request to seal a portion of a deposition transcript; Judge Feldman found good cause to designate the transcript as "confidential information" pursuant to the parties' Confidentiality Order, but he stated that the designation was without prejudice to Plaintiff's request to remove it at any time. Defendants cannot be heard to complain about Plaintiff filing a motion that was specifically permitted by the judge overseeing discovery.

Finally, Defendants suggest, without explanation, that it was improper for Plaintiff to move to compel the testimony of the victim. They apparently blame Plaintiff because pro bono counsel was required to be appointed for the victim, who subsequently filed a Motion to Quash. However, Defendants cannot plausibly argue that the victim did not have knowledge relevant to the underlying factual dispute. Indeed, the Motion to Quash was withdrawn, prior to oral argument, after "all parties . . . agreed to stipulations on the limited subject matter of [the victim]'s consensual sexual

partner in the relevant period before the rape, and to rely on [the victim]'s prior hearing and trial testimony" in lieu of the victim providing testimony in this matter. In sum, Defendants have not established that Plaintiff's Attorneys engaged in unnecessary or redundant motion practice such as would warrant a reduction of their fee award.

### CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff is entitled to the following damages: $5 million for loss of liberty and emotional distress during his wrongful incarceration; $750,000 for future non-pecuniary losses; $442,374 in lost wages, for a total damages award of $6,192,374. Furthermore, for the reasons discussed above, the Court awards the following in attorney's fees and litigation costs: $700,000 in attorney's fees, to be shared equally by Plaintiff's Attorneys, i.e., $350,000 to Attorney Thompson of ETKS, and $350,000 to Attorney Brustin of NSB; and $70,000 in litigation costs to be apportioned by Plaintiff's Attorneys on the basis of their respective contributions. These damages awards, attorney's fees, and litigation costs are payable to Plaintiff by Defendants as specified in the Settlement Agreement (Dkt #114).

SO ORDERED.

S/ Michael A. Telesca
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    August 5, 2016
          Rochester, New York